**Wanda Jean ALLEN, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–89–549.**

Court of Criminal Appeals of Oklahoma.

Feb. 15, 1994.

Rehearing Denied March 30, 1994.

---

Bob G. Carpenter, Oklahoma City, trial counsel, William H. Luker, Asst. Appellate Public Defender, Norman, appellate counsel, for appellant.

Sandra H. Stensaas, Asst. Dist. Atty., Oklahoma City, Wes Lane, Asst. Dist. Atty., Oklahoma City, trial counsel, Susan Brimer Loving, Atty. Gen. of Oklahoma, David Walling & A. Diane Blalock, Asst. Attys. Gen.,

Oklahoma City, appellate counsel, for appellee.

## OPINION

LUMPKIN, Presiding Judge:

Appellant Wanda Jean Allen was tried by jury and convicted of Murder in the First Degree (21 O.S.Supp.1982, § 701.7), and Possession of a Firearm After Former Conviction of a Felony (21 O.S.Supp.1983, § 1283), Case No. CRF–88–6621, in the District Court of Oklahoma County. The jury found the existence of two aggravating circumstances and recommended death as punishment for murder and ten (10) years for felonious possession of a firearm. The trial court sentenced accordingly. From this judgment and sentence Appellant has perfected this appeal. We affirm the judgment and sentence for murder, but reverse and remand for a new trial on the firearm charge.

The charges against Appellant stemmed from the shooting of Gloria Leathers on December 1, 1988, in front of the police department in the Village, Oklahoma. Ms. Leathers and Appellant had been involved in a homosexual relationship, and Ms. Leathers did not wish to continue the relationship. After a dispute over a welfare check between Ms. Leathers and Appellant, Ms. Leathers decided to move out. Accompanied by police, she went to the residence the two shared and gathered some of her belongings. A dispute arose, apparently concerning the ownership of some of the belongings, and Ms. Leathers went to the police station at the suggestion of one of the officers at the house. Appellant followed in a separate car, and outside the station attempted to get Ms. Leathers to reconsider moving out. The shooting occurred during this discussion. Appellant fled and was not captured until December 5, the same day Ms. Leathers died from a single gunshot wound Appellant had fired into her abdomen.

## I. PRE–TRIAL ISSUES

### A.

In her fifth proposition of error, Appellant asks this Court to reverse because a record was not made during some pre-trial hearings, and some isolated instances during voir dire and trial. Specifically, she complains a record was not made of her district court arraignment; her counsel's motion to withdraw; hearings on the prosecution's motion to submit to tests and provide handwriting exemplars; hearings on her motion for a private investigator at public expense; her motion to suppress; and her motion for preparation of preliminary hearing transcript. She also complains of two lapses during the trial itself: one concerning a discussion of instructions; the other after Appellant testified during the punishment stage. We shall address each separately, but first we examine the rationale for a complete record.

Appellant cites *Van White v. State*, 752 P.2d 814, 820–22 (Okl.Cr.1988) and *Kelly v. State*, 692 P.2d 563, 565–66 (Okl.Cr.1984) in support of her claim that reversal is mandated when all proceedings in a capital case are not transcribed. In *Kelly*, Judge Brett wrote a special concurrence in which he submitted it was the responsibility of the State to assure all proceedings were transcribed in a death penalty case. He reasoned this Court could not conduct its mandatory sentence review pursuant to 21 O.S.1981, § 701.13 without a complete record of all proceedings. The portions missing in that case were all connected with the actual jury trial. *Id.* at 565–66. In *Van White*, this Court expanded on the rationale for the requirement. There, this Court reviewed *Kelly* and held that "in order to effectuate this Court's mandatory sentence review obligation under 21 O.S.Supp.1985, § 701.-13(C)(1), a complete stenographic record shall be taken in all capital proceedings." *Van White*, 752 P.2d at 821. As in *Kelly*, *Van White* concerned itself with failure to transcribe proceedings during the actual jury trial.

■ Appellant has placed emphasis on the language "in all capital proceedings." While we do not retreat from our holding a complete record should be transcribed in all proceedings in which the death penalty is imposed, we must examine the underlying basis of the rule to see if failure to do so warrants

automatic reversal, or whether such a failure can be harmless.

■ Oklahoma's modern death penalty statutes came into being in response to the Supreme Court's holding in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) that death penalty procedures such as Oklahoma's violated the ban imposed by the Eighth Amendment to the United States Constitution[1] on cruel and unusual punishment. Essentially, the older procedure was constitutionally infirm because there was no way to distinguish cases which warranted the death penalty under the law. In response our Legislature adopted procedures similar to those found to be constitutionally acceptable in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) and subsequent cases. Essential portions of the new procedure included a requirement of proof of aggravating circumstances to distinguish those deserving the death penalty from those who did not; and the requirement that this Court conduct a sentence review to determine:

1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

2. Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 701.12 of this title.

21 O.S.1991, § 701.13(C). From this, one can deduce the primary need for a complete record in all death penalty proceedings is to allow an appellate court to determine whether the factfinder imposed the punishment of death as a result of any improper influence, and whether the evidence supports such a finding. In other words, the portion of the mandatory sentence review that concerned this Court in *Van White* and *Kelly* dealt with issues at *trial*, as it is during trial the jury or judge actually makes the determination whether the death sentence should be imposed. Therefore, that is the essential portion of the proceedings this Court requires to determine if the sentence were imposed in

violation of the Eighth Amendment. And while this Court is also required to consider "any errors enumerated by way of appeal," 21 O.S.1991, § 701.13(B), those other errors do not necessarily always implicate the Eighth Amendment—or any constitutional provision, for that matter. If alternate means exist for this Court to make a determination without the complete transcription, it will do so, and reversal is not warranted. *See Van White*, 752 P.2d at 819 (rejecting Appellant's argument that reversal was mandated because a motion hearing was not transcribed, as this Court could make a finding that the trial judge's ruling was supported by competent evidence without the transcript).

■ Appellant complains here the motion for preparation of a preliminary hearing transcript was not transcribed. While refusal to make a transcript available to an indigent defendant can be a violation of the defendant's right to Equal Protection under the Fourteenth Amendment, no such error occurred here, as Appellant received a copy of the transcript. Therefore, this Court does not need a transcription of the motion to determine a constitutional violation did not take place; and failure to transcribe the hearing is harmless error. 20 O.S.1991, § 3001.1.

■ Likewise, this Court can determine from the record Appellant appeared at arraignment, received a true copy of the information and the list of witnesses to be used at trial, waived reading of the information and pled not guilty, was denied bond and was given deadlines to file necessary motions. That is essentially all that transpires at arraignment, *see* 22 O.S.1981, §§ 451–470, and Appellant has presented no allegations in her propositions of error anything improper occurred at that time.

■ Concerning the motions for blood sample and handwriting exemplar, this Court has held such samples can be given without violating any constitutional rights of the Appellant so long as she is afforded notice and an opportunity to be heard. *State v. Thoma-*

---

1. Hereafter, all references to constitutional provisions will refer to the United States Constitu-

tion, unless otherwise noted.

*son,* 538 P.2d 1080, 1087 (Okl.Cr.1975); *Elix v. State,* 743 P.2d 669, 673 (Okl.Cr.1987). Here, the record reflects both were honored. In fact, the record shows Appellant agreed to provide blood samples.

■ We find no indication in the record Appellant's motion to suppress was argued or decided. However, we have examined both the motion and the entire record, and find nothing seized in violation of the Appellant's Fourth Amendment rights which was used against her at trial, and find her statement to police was not given in violation of her Fifth Amendment rights. We therefore determine any error in failing to transcribe the hearing was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Appellant also argues error in failing to transcribe hearings dealing with her motion for a state-appointed investigator and her attorney's motion to withdraw as counsel. We will address this argument as a part of propositions six and seven.

■ Appellant lists two instances where an off-the-record discussion was held during trial. One of those dealt with discussion of jury instructions, and the court afforded both sides an opportunity to make a record of that discussion. The record reflects the discussion was held out of the hearing of the jury. Neither side had objection; therefore, no reversible error occurred by the court's failure to make a record of the discussions, as there was nothing contested concerning the instructions for this Court to review. The other instance occurred after Appellant had testified, and the parties discussed a stipulation. Following the off-the-record discussion, the parties further discussed the stipulation. It is obvious to this Court the off-the-record discussion dealt with the stipulation, and in any case was outside the hearing of the jury; therefore, there can be no argument the discussion unduly influenced them in any way, thus precluding any Eighth Amendment violation.

■ Appellant lists two instances of off-the-record discussions during voir dire. While these omissions require more analysis, we do not find these isolated instances rise to the level requiring reversal. The first one occurred during the voir dire of prospective juror Scott. The court informed him of the charges when the following exchange took place:

THE COURT: The law—

MR. SCOTT: Can I take a break a minute?

THE COURT: Oh, sure.

MR. SCOTT: I am—

THE COURT: Getting a little queasy?

MR. SCOTT: I have a little blood sugar problem and it's been a while since I ate.

MR. SCOTT: No. I'm okay. I need—

(Whereupon, an off-the-record discussion was had, after which the following proceedings were had in-camera:)

THE COURT: All right. You understand though that—I mean I don't want you to seriously—honestly I want you to tell us if you need to take a break. Okay?

MR. SCOTT: Okay.

THE COURT: 'Cause that would be something I wouldn't want to deal with. All right. Mr. Scott, as I mentioned the Defendant is charged with murder in the first degree. . . . [the court here informed the prospective juror of the nature of the charges against Appellant]

MR. SCOTT: Bless you. What am I supposed to do? Eat in front of you?

THE COURT: Yes, you are.

MR. SCOTT: Okay.

THE COURT: All right. my question— I'm going—did I get him with a mouth full of peanut butter here?

MR. SCOTT: I'll time you.

THE COURT: Okay.

. . . .

THE COURT: My question is in all seriousness, if you're selected as a juror in this case and if you find beyond a reasonable doubt that the Defendant is guilty of murder in the first degree and I ask you given all the facts and circumstances that you'll know at that time in the case and the instructions you have from me, can you consider all three legal punishment op-

tions, life, life without parole, and the death penalty?

MR. SCOTT: Yes.

From the surrounding discussion, it is obvious to this Court the off-the-record discussion dealt with the prospective juror's health problems and the acquisition of some food so he would not faint during voir dire. Once that was resolved, the court continued its questioning on the record.

The second off-the-record discussion occurred after the jury was sworn and before alternates were chosen:

THE COURT: .... If counsel would approach the bench for a minute?

(Whereupon, an off-the-record discussion was had; afterwhich [sic] the following proceedings were had in open court:)

THE COURT: Ms. Joiner, would you approach please? Would you come up?

MS. JOINER: Me?

THE COURT: Yes, ma'am. If you come right down in front, Ms. Joiner. I've advised the counsel what you told me about your husband being very ill and we all agreed to release you at this point.

MS. JOINER: Thank you.

THE COURT: Thank you.

Likewise, from the proceedings surrounding the off-the-record discussion, it is obvious the discussion centered around an illness in a prospective juror's family, and had nothing to do with whether a prospective juror could decide to give Appellant the death penalty. There was no Eighth Amendment violation, and the procedural error was harmless. 20 O.S.1991, § 3001.1.

There is no merit to this proposition.

2. In considering this affidavit, we in no way retreat from our position in *Brown v. State*, 871 P.2d 56 (Okl.Cr.1994), that supplementations of the record on appeal are not favored and ordinarily will not be granted. Here, however, Appellant earlier argued her conviction must be reversed because the court failed to make a record of all proceedings in her capital case. In that vein and in this isolated instance, we have determined we will allow the supplementation to assist us in determining whether the failure to transcribe the hearing and failure to appoint an investigator were harmless error.

**B.**

In her sixth assignment of error, Appellant argues the court erred in denying her a private investigator at public expense. Appellant's motion filed with the trial court did not give specific reasons why an investigator was necessary. The hearing on the motion was not transcribed, but Appellant has filed an affidavit of trial counsel, which, in connection with the evidence presented at trial, assists us in making the proper determination.[2] In the affidavit, trial counsel said he needed the investigator to more fully investigate Appellant's defense of self-defense and the lesser charge of manslaughter. Based on the evidence presented at trial, including that by Appellant, we have concluded these theories had no merit, *see* III.A., *infra;* and in light of the overwhelming evidence of guilt of murder, we conclude Appellant failed to establish prejudice "by clear and convincing evidence" in the court's refusal to appoint an investigator. *Munson v. State*, 758 P.2d 324, 330 (Okl.Cr.1988), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 809 (1989) (citing *Mason v. Arizona*, 504 F.2d 1345, 1352 (9th Cir.1974), *cert. denied*, 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975).[3]

We see no merit to this proposition.

## II. ISSUES RELATING TO JURY SELECTION

**A.**

In her tenth proposition of error, Appellant alleges the prosecution improperly exercised a peremptory challenge of a black juror in violation of *Batson v. Kentucky*, 476 U.S. 79, 98, 106 S.Ct. 1712, 1724, 90 L.Ed.2d

3. A statute in effect at the time of trial (since repealed) required a defendant in Appellant's position to demonstrate the services of the expert are "reasonably necessary to permit the defendant to adequately prepare and present his defense at trial...." The trial court was then authorized to rule on the "reasonableness of the request." 22 O.S.Supp.1985, § 464. In light of our holding the reasons given for the investigator are without merit, we need not address the question whether the court abused its discretion in Appellant's case.

69 (1986). Appellant is also African–American.

■ *Batson* holds that once a prima facie case of discriminatory selection is established, the prosecution can rebut the appellant's case by giving a racially neutral explanation for the peremptory challenge. *Id.* at 98, 106 S.Ct. at 1724. It also observes this explanation need not rise to the level justifying excusal for cause, *Id.,* 476 U.S. at 97–98, 106 S.Ct. at 1723–1724; and the findings of the trial court are entitled to great deference. *Id.* at 98 n. 21, 106 S.Ct. at 1724 n. 21. Here, the prosecution offered as reasons for excusing the black venire person the fact she made a facial expression by raising her eyebrows when she said she could consider the death penalty; that she had been hesitant when asked about the death penalty; that she avoided making eye contact with the prosecutors, but not with defense attorneys; and she dozed off during the prosecutor's general voir dire. We believe these reasons are sufficiently neutral to pass constitutional muster. *See Boltz v. State,* 806 P.2d 1117, 1123 (Okl.Cr.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991); *Smith v. State* 737 P.2d 1206, 1216 (Okl.Cr. 1987), *cert. denied,* 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987) (hesitancy about death penalty); *United States v. Power,* 881 F.2d 733, 739–40 (9th Cir.1989) (fidgeting caused concern juror might not be attentive during trial); *United States v. Ruiz,* 894 F.2d 501, 506 (2d Cir.1990) (facial expressions indicating possible reluctance of juror to sit in trial deemed sufficient reason).

We find no merit in this proposition.

### B.

Appellant argues in her twelfth proposition of error the court erred in preventing counsel from inquiring into prospective jurors' views on life without parole. We disagree. In the instances Appellant has cited, the record clearly indicates defense counsel had the opportunity to pose appropriate questions to each juror concerning the punishment options to be considered.[4]

■ Nor is there merit to Appellant's complaint the trial court refused to allow counsel to inquire as to lesser included offenses. The purpose of voir dire is to ascertain whether there are grounds to challenge prospective jurors for bias and to permit the intelligent exercise of peremptory challenges. *Palmer v. State,* 532 P.2d 85, 88 (Okl.Cr. 1975). Here, although counsel did not ask his specific question, every juror who was asked indicated he or she could follow the applicable law given to them by the trial court. This indicates to us each juror indicated he or she could consider a lesser included instruction. We find no abuse of discretion in the court's refusal to allow counsel's question about lesser included offenses. *Sellers v. State,* 809 P.2d 676, 682 (Okl.Cr. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991); *Banks v. State,* 701 P.2d 418, 423 (Okl.Cr.1985).

### C.

■ Appellant also contends the trial court improperly excused prospective jurors who said they could follow the court's instructions despite having reservations about the death penalty. In this thirteenth proposition of error, Appellant alleges the court improperly excused prospective jurors Webb and Alexander.

This Court has held that

not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state *clearly* that they are willing to temporarily set aside their own beliefs in deference to the rule of law.

---

4. In questioning prospective juror Johnson, defense counsel stated: "[t]here's two life in prisons, one is with no possibility of parole and the other is life in prison. Now what do you deduct from those two options?" (Transcript of voir dire at 104). In questioning Mr. Drye, defense counsel stated: ". . . the legislature in its wisdom has set out three separate and distinct possibili-

ties, one of those being life in prison. And do you have any preconceived notions about what that means?" He also asked the same person: "[d]o you have any preconceived notions about what [sic] life without the possibility of parole?" (voir dire at 596–97). As we are not called to do so, we make no determination at this time whether these questions are proper.

*Battenfield v. State,* 816 P.2d 555, 559 (Okl. Cr.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992) (quoting *Lockhart v. McCree,* 476 U.S. 162, 176, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137 (1986)) (emphasis added).

██ Here, prospective juror Webb gave contradictory answers, appearing indecisive in response to questioning by the court; then agreeing with the prosecutor, then defense counsel. She had reservations about the death penalty, but did not clearly indicate she could set those reservations aside and follow the law. The following exchange at the end of her questioning is typical:

THE COURT: ... if you were a member of the jury could [you] in fact select the death penalty as the appropriate punishment if that were what the law provided and that's what the evidence showed?

MS. WEBB: If that was what the law provided.

THE COURT: Yes, ma'am. And if that's what the evidence showed. Now, understand, Ms. Webb, I'm not going to tell you that the law is going to tell you which of the three options you should choose. You know, the law is going to give you some parameters, some guidelines, for you to use, but when it comes right down to it should there be a finding of guilt the jury will have those three options in front of it, you know.

They won't—I won't tell you which one is appropriate. You know you would still have to make that decision and in order to be fair to both sides you have to be able to tell me that you will in fact consider all of those options and the evidence presented on all three before making your decision and you would not rule out one or two of any of the particular punishment options? Could you do that?

MS. WEBB: No.

(voir dire Tr. 51). In situations when a juror's answers are unclear and contradictory, this Court traditionally defers to the impressions of the trial judge, who "may have a definite impression that the prospective juror would be unable to fulfill his or her oath." *Duvall v. State,* 825 P.2d 621, 631 (Okl.Cr. 1991); *Battenfield,* 816 P.2d at 559.

The same is true of prospective juror Alexander, who despite repeated questioning indicated both a confusion as to the procedure to be used and reluctance to consider the death penalty as a viable option:

THE COURT: Could you consider the death penalty as a viable option as something if you thought the circumstances warranted it? You could in fact impose it?

MS. ALEXANDER: No, I don't really think I could, not really. I don't think I have it in me.

THE COURT: Okay. Well I appreciate it and I'm not—certainly not fussing with you at all, but you understand you kind of have given both answers and I think it's in an effort to really truly tell us how you feel.

MS. ALEXANDER: Yes.

THE COURT: But—I appreciate that. But earlier my question was if you're sworn in as a juror in this you're taking an oath to follow the instructions—

MS. ALEXANDER: Yes.

THE COURT: —that I give you and again my instruction is that we get to that point of punishment and there's been a finding of guilty of murder in the first degree then my instruction would be that you are to consider all the evidence and determine after consideration each of the three punishments which punishment is most appropriate. Do I hear you say that if you considered the death penalty and even if you thought it was the most appropriate punishment that you would not be able to vote that way?

MS. ALEXANDER: That's right. That's exactly what—I don't think I could.

(voir dire Tr. 759–60). Again, the juror clearly indicated she could not put aside her personal feelings and impose the death penalty in a proper circumstance. After considering the entire record surrounding the prospective jurors' exclusion, and giving appropriate deference to the trial judge, we hold the responses "sufficiently demonstrated that [the jurors] beliefs about capital punishment would 'substantially impair [their] ability to serve as a juror.'" *Battenfield,* 816 P.2d at

559 (quoting *Coleman v. Brown,* 802 F.2d 1227, 1232 (10th Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987)).

## III. ISSUES RELATING TO TRIAL

### A.1

■ In his first proposition of error, Appellant claims the trial court erred in refusing testimony in support of her defense of self-defense. Appellant testified she was fearful of the decedent because decedent had said she killed a woman in Tulsa ten years earlier. She sought for purposes of corroboration to introduce testimony by the decedent's mother, Ruby Wilson, that the decedent had told Ms. Wilson the same story. The trial court ruled the evidence inadmissible hearsay. The State on appeal acknowledges the evidence was not offered to prove the truth of the matter asserted, *see* 12 O.S. 1981, § 2801(3), but responds the alleged Tulsa homicide was too remote to be of significant value in her self-defense claim. In making their arguments, both sides assume Appellant had a valid defense of self-defense. We disagree, and therefore hold it was not error to exclude the proffered testimony.

For the sake of argument and for purposes of analysis *only,*[5] we shall use only Appellant's version of events to illustrate why her theory of self-defense was not warranted.

Appellant testified that after a dispute at a supermarket over possession of a welfare check, the decedent, accompanied by her mother and police officers, returned to the house and gathered some of her possessions. Appellant asked the decedent to stay and attempt to work out their difficulties. When Appellant followed the decedent to her car, decedent grabbed a small, hand-held, multiple-pronged gardening tool, identified at trial as a garden rake, and struck Appellant in the face with it, causing extensive bleeding beneath Appellant's eye. Appellant retreated into the house to minister to her wounds; the decedent got into the car and left.

Appellant testified she cleaned the blood off her face with a small towel; then drove to the police station where she knew the decedent was going. Despite the time involved in going into the house at the same time the decedent left, then wiping her face, she told the jury she followed approximately two car lengths behind the decedent. The vehicle in which the decedent was riding was parked in a drive area of the police department, off of the street. Appellant parked in the street, behind the decedent's vehicle but not blocking it. Appellant got out of her car and reached the rear of the decedent's vehicle when she noticed the decedent approaching her, holding the garden rake. At that point, Appellant said she retreated back to her vehicle, opened the passenger door, and retrieved a pistol she kept in the glove compartment. She turned around to see the decedent very near her. She claimed she accidentally shot the decedent during an ensuing scuffle.

■ There are several flaws in Appellant's self-defense theory. It has long been Oklahoma law that, even if a person is an aggressor, he can lose that status by clearly withdrawing from the fight. He can evince that desire to withdraw by either word or act, so long as his intentions are clear. *Evans v. State,* 89 Okl.Cr. 218, 206 P.2d 247, 252 (1949). It is also true if a party who was the attacker withdraws and the other party pursues more than is necessary to ensure her safety, the pursuing party can take on the status of attacker, and lose the right of self-defense. *Peterson v. State,* 86 Okl.Cr. 302, 192 P.2d 286, 288 (1948); *Smith v. State,* 19 Okl.Cr. 14, 197 P. 514, 516 (1921); *Gransden v. State,* 12 Okl.Cr. 417, 158 P. 157, 161 (1916); *see also State v. Heath,* 237 Mo. 255, 141 S.W. 26, 30 (1911). Here, the decedent, by getting in the vehicle with her mother, leaving the house, and going to the police station, clearly indicated a desire to withdraw; and Appellant, who had gone in her own house, was out of danger. When she followed the decedent, she arguably became

---

**5.** Other testimony, of course, strongly conflicted with Appellant's version of events. That evidence is discussed below.

the pursuer, an observation that is strengthened by subsequent actions.

■ It is also true a person does not have to be an aggressor or provoke a fight with the intent of killing the other party to be deprived of the right to self-defense. If a person by provocative behavior initiates a confrontation, even with no intention of killing the other person, she loses the right of self-defense. *Ruth v. State*, 581 P.2d 919, 921–22 (Okl.Cr.1978). Here, even assuming Appellant did not intend to provoke an argument when she pursued the decedent to the police station, she re-initiated the encounter by her actions. She knew the decedent was upset, yet she pursued her anyway, knowing the possibility of a confrontation was strong.[6]

■ More to the point, based on Appellant's testimony, when she walked behind the decedent's vehicle, saw the decedent approach with the same gardening tool, then withdrew to her own car to retrieve the weapon, she lost the right of self-defense. It is true a party has no obligation to retreat from a confrontation; she can stand her ground and defend herself. *Perez v. State*, 51 Okl.Cr. 180, 300 P. 428, 429 (1931). Nonetheless, there must be a distinction between retreating to avoid a confrontation and withdrawing a short distance to obtain a tactical advantage—here, the acquisition of a deadly weapon. *See State v. Heath*, 237 Mo. 255, 141 S.W. 26, 30 (1911); *Jackson v. State*, 2 Ala.App. 55, 56 So. 96, 98 (1911). Appellant was able to reach her vehicle; yet when she did, she grabbed a weapon, turned and confronted her attacker instead of escaping. While we do not overrule our earlier holdings that a party has no duty to retreat from a confrontation, we believe the possibility of escape should be a recognized factor in determining whether deadly force was necessary to avoid death or great bodily harm. *See State v. Freeman*, 447 So.2d 1145 (La.Ct. App.1984), *writ denied*, 449 So.2d 1356 (La. 1984).

■ It is true instructions on self-defense should be given if there is evidence to support it. However, if there is no evidence to support self-defense, the trial court is under no obligation to give the instructions. *Ridinger v. State*, 97 Okl.Cr. 377, 267 P.2d 175, 183 (1954). Here, even limiting review to Appellant's version of events, we find the Appellant was not entitled to instructions on self-defense. While we commend the district court for erring on the side of caution, we nonetheless find error here in allowing instructions on self-defense; an error that benefitted Appellant. Consequently, evidence in support of that theory was not error.

### A.2

■ Nor is there merit to Appellant's argument the evidence should have been admitted to support her heat-of-passion manslaughter theory. While we have set forth Appellant's version of events, other testimony strongly conflicted with Appellant's version of events. The decedent's mother, who was with the decedent and driving the vehicle, testified the decedent did not at any time attack Appellant with a garden tool. An officer at the residence during the first encounter, fearing the tool would be used in a fight, had picked up the hand rake and concealed it under some clothing in a basket in the rear seat of decedent's car. He noticed the rake was in the same position when he examined the basket after the shooting. The same officer saw the decedent's car pull away from the residence immediately after he did; and there had been no assault while he was there. A second officer testified he drove back around to the residence approximately one minute after he had left and saw neither the decedent's nor Appellant's cars. Despite Appellant's claim of copious amounts of blood from the wound, an examination of her vehicle revealed no blood; and a search of her residence the night of the shooting revealed no bloody towels. While Appellant did have a small wound underneath her eye when she was captured four days after the shooting, the one person who saw Appellant immedi-

---

6. In making this statement, we do not necessarily hold Appellant by her actions in following the decedent intended to provoke a confrontation. We merely state that this action, combined with actions discussed below, should be considered in determining whether the theory of self-defense is justified.

ately after the shooting—when Appellant gave her the gun she had used—looked at Appellant's face and saw no injury or evidence of blood.

Even though the hearsay statement of the decedent's mother was not admissible, Appellant herself took the stand and explained to the jury she feared the decedent because the decedent told her she had killed someone, thereby getting the desired information in front of the jury. *See Boltz v. State*, 806 P.2d 1117, 1123 (Okl.Cr.1991); *see also* 12 O.S.1981, § 2404(A)(2). The trial court's refusal to admit the hearsay testimony of the decedent's mother was not error.

This assignment of error is without merit.

### B.

In light of our finding that instructions on self-defense were not warranted, Appellant's eighth proposition of error concerning error in the court's failure to give an additional self-defense instruction is also without merit.

### C.

■ Appellant contends in her ninth proposition of error the court erred in not *sua sponte* instructing on second-degree murder and second-degree manslaughter, even though she did not request either instruction. Appellant testified she retreated to her vehicle, grabbed her gun, and turned around to confront the decedent. She testified she was frightened at the time. Under these facts, an instruction on second-degree manslaughter is not warranted. This finding is reinforced since Appellant re-entered the confrontation with a pistol. *See Young v. State*, 84 Okl.Cr. 71, 179 P.2d 173, 175 (1947). Additionally, even if Appellant was afraid and did not intend to injure the deceased, this evidence clearly does not fit the statutory requirement of second degree murder that the accused show conduct evincing a depraved mind in extreme disregard of human life. *Cf. Smith v. State*, 674 P.2d 569, 571 (Okl.Cr.1984) (act of swerving car toward children showed evidence of depraved mind, even though appellant claimed he did not intend to injure anyone by his actions; the deliberate manner in which the car was driv-

en contained the appropriate *mens rea*); and *President v. State*, 602 P.2d 222, 225–26 (Okl. Cr.1979) (conviction modified from second degree murder to manslaughter based on evidence that appellant killed his lover after she told him she had sex with another man; conduct under the circumstances evinced more a heat of passion than a depraved mind). As noted above, to assume Appellant's version is the accurate version is to ignore other evidence produced at trial. The evidence does not support the giving of either instruction as a lesser included offense.

This proposition is without merit.

### D.

■ In her second proposition of error, Appellant claims the court erred in allowing her videotaped confession without an accompanying diagram. On the videotape, Appellant drew something on a piece of paper in an effort to show officers where she had parked her vehicle when she arrived at the police station. The rough diagram was not preserved.

We see no reversible error. A complete viewing of the videotape indicates that at a point before Appellant drew her rough diagram, she used her hands and the table at which she was sitting to indicate relative positions of the vehicles. This, combined with her testimony at trial during which she contradicted the diagram drawn by police officers and demonstrated to the jury where she recalled the vehicles being parked, allowed her to communicate to the jury her version of where things were located and what transpired. In this way, the jury did in fact receive all the facts and circumstances surrounding the confession, *see Williams v. State*, 542 P.2d 554, 573–74 (Okl.Cr.1975), *modified on other grounds*, 428 U.S. 907, 96 S.Ct. 3218, 49 L.Ed.2d 1215 (1976), and any error in admitting the videotape without the diagram was harmless beyond a reasonable doubt. This proposition is without merit.

### E.

■ In another videotape-related complaint, Appellant complains on appeal the trial court acted improperly on a request of

the jury after deliberations started. The jury sent the court a note stating it wished to review the tape. During an ensuing in-camera discussion, Appellant's trial counsel objected to the trial court's questioning the jurors to determine which specific portion the jury wished to hear. Consequently, the trial court sent the jurors a note telling them to decide whether they wished to review the entire tape. The jury indicated its desire to review the entire tape, and it was replayed for them in open court.

Appellant now complains the court erred in not ascertaining what specific problems the jurors were having in connection with the tape, citing *Martin v. State*, 747 P.2d 316, 320 (Okl.Cr.1987). This Court's primary concern in *Martin* was the jury's unrestricted use of videotaped testimony of a seven-year-old sexual abuse victim in the jury room. *Martin* contains language that a trial court which has received a request to review evidence should ascertain the precise nature of the jury's difficulty, isolate the requested testimony that can solve it, then weigh the probative value of the testimony against the danger of undue emphasis. *Id.* However, we observe here the court responded in accordance with trial counsel's wishes on the subject. Therefore, any error that occurred was invited by defense counsel, and Appellant cannot profit from those actions on appeal. *Thomas v. State*, 744 P.2d 974, 976 (Okl.Cr.1987); *Cooper v. State*, 671 P.2d 1168, 1172 (Okl.Cr.1983). We further note the tape being played was not testimony of a witness at trial, but rather was a conversation between Appellant and police. *See Duvall v. State*, 780 P.2d 1178, 1180 (Okl.Cr. 1989). Nor do we see error in the prosecution's turning up the volume on the tape at one point. The record indicates the prosecutor turned up the volume in response to a signal by a juror, who indicated she was having difficulty hearing the tape. We do not agree with Appellant this act emphasized any particular portion of the tape. Appellant has failed to show how this act at the request of the juror was prejudicial. This proposition is without merit.

F.

In her fourteenth proposition of error, Appellant complains the trial court erred in allowing in evidence Appellant was the "man" in her homosexual relationship with the decedent. The evidence came in the form of lay opinion testimony from the decedent's mother, based on her observations of the two. It was used to show Appellant was the aggressive person in the relationship, while the decedent was more passive.

We do not believe the court erred in allowing in the evidence. As we stated in *Green v. State*, 713 P.2d 1032 (Okl.Cr.1985), *cert. denied*, 479 U.S. 871, 107 S.Ct. 241, 93 L.Ed.2d 165 (1986), section 2701 of the evidence code has "substantially liberalized the admission requirements" for introduction of lay witness opinion. Now, such opinions "should be rejected *only* when they are not rationally based on the perception of the witness, or the opinion is superfluous in the sense it would be of *no value* to the trier of fact." *Id.* at 1039 (emphasis in original). If such evidence can be helpful to the jury, it is within the discretion of the trial judge to admit it. *Id.*

Here, the witness was able to make observations of conduct by her daughter and Appellant, even though she may not have spent a great amount of time around the household. The evidence would help the jury understand why each party acted the way she did both during events leading up to the shooting and the shooting itself. The very reason for the shooting was the decedent's leaving Appellant and intention to terminate the relationship. Under these circumstances, its probative value was not substantially outweighed by its prejudicial effect, *see* 12 O.S.1981, § 2403, and the evidence was properly admitted.

### IV. ISSUES RELATING TO PROSECUTORIAL MISCONDUCT

In her fourth complaint, Appellant claims several instances of prosecutorial misconduct. She first complains the State improperly portrayed the decedent as a gentle, weak individual, while refusing to allow Ap-

pellant to show the decedent's other side—that of a hardened, violent criminal. She again bases her complaint on her self-defense theory. As we held that theory to be invalid in this case, *see supra*, that portion of her complaint is without merit.

Additionally, we note that virtually none of the remarks of which she now complains drew an objection at trial, and are therefore waived on appeal. *Clayton v. State*, 840 P.2d 18, 29 (Okl.Cr.1992). While we find somewhat disturbing the prosecutor's conduct in first objecting to the introduction of evidence by the decedent's mother concerning the decedent's killing of a woman years earlier, then commenting during closing the only evidence of the decedent's violent behavior came from Appellant, we see no fundamental error. Error in refusing to admit evidence when that evidence should have been admitted is an error committed by the court, not of the prosecutor, and will not be reversed absent a miscarriage of justice or a substantial violation of a constitutional or statutory right. 20 O.S.1991, § 3001.1. The prosecutor has a right to comment on evidence that has been allowed before the jury, and we find the comments concerning Appellant's behavior and the decedent's behavior fall within the range of fair comment allowed both prosecutors and defense attorneys. *Romano v. State*, 847 P.2d 368, 380 (Okl.Cr. 1993); *Clayton*, 840 P.2d at 29. We find no Due Process violation present in these actions in light of the fact we found her self-defense theory to be invalid.

We also disagree the prosecutor misstated evidence by commenting the path of the bullet made Appellant's version of the incident "impossible." While "impossible" might have been too strong a word, the jury had heard evidence from the medical examiner making her version unlikely. No fundamental error occurred in light of the overwhelming evidence presented against Appellant. There is no error in commenting that none of Appellant's blood was found in her vehicle. Although the interior of her car was a maroon color, the criminalist who processed the car said the blood would have been a darker color than the interior, and would have been visible had it been present.

The prosecutor's statement was a fair comment on the evidence. *Clayton*, 840 P.2d at 29. Likewise supported by some evidence—although not Appellant's version of it—was the prosecutor's comment during the second stage Appellant had chased down an unarmed friend, Detra Pettus, seven and one-half years earlier and shot her in the same manner she did the decedent. The jury heard evidence in the second stage Pettus died from a contact wound to the abdomen, which would not have been possible from the distance Appellant said she fired the shot; and that Pettus had contusions on the back of her skull, consistent with being pistol whipped.

In addition, there is no merit to Appellant's contention the prosecutor misstated the law. She first points to an isolated instance where the prosecutor told the jury "... you do not kill Wanda Jean Allen. All you do is return a death verdict. You don't kill her and I don't kill her. All you can do is return a death verdict. That's all you do." The Appellant cites *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) in support of his argument that the prosecutor attempted to convince the jury the responsibility for determining the death sentence rested somewhere other than on their shoulders. To establish a *Caldwell* violation, "a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989).

The remark, when taken in context, does not improperly describe the jury's role. In the same closing argument, the prosecutor also said "it's difficult for myself and for Mr. Lane to get up here and talk to you and ask you to sentence this Defendant to death. It's very difficult. Just like it's going to be difficult for you 12 people to go back there and render a verdict that is justice in this case.... We told you during voir dire that your job here would not be easy nor would it be one that you appreciated or that you would enjoy doing, ..." Following the complained-of remark, the prosecutor observed Appellant placed herself in her predicament

and put the jurors in the position they found themselves at that time. The prosecutor reminded the jurors they had been told during voir dire their job would not be easy or fun, adding that jurors during their deliberations occasionally "cuss at each other, they scream, they yell. We hear people throwing things at each other, and sometimes all you—sometimes the jurors all they do is bow their heads and pray," indicating their job is an agonizing one. Based on the argument in its entirety, we do not believe the prosecutor was attempting to diminish the jury's role by telling them the responsibility for Appellant's fate rested elsewhere.

█ Nor is there merit to the allegation the prosecutor attempted to define reasonable doubt by saying the prosecution's burden need not be beyond all doubt or a shadow of a doubt. This Court rejected a proposition of error based on nearly identical language in *Vaughn v. State* 697 P.2d 963, 967 (Okl.Cr.1985). We reject it again.

█ Appellant complains the prosecutor improperly criticized her during closing argument, making references to her status as the dominant person in a homosexual relationship. We find no error. The relationship was critical to the jury's understanding of the facts surrounding the shooting and was a proper factor for the jury to consider. *See* 21 O.S.1981, § 695 (jury can take into consideration the existence of a domestic relationship in determining the grade or punishment of a homicide). We have examined other complained-of comments—that she had been crying during trial in an effort to show remorse, contrasting that behavior with evidence showing a lack of remorse; observing she had changed her story one hundred and fifty times; and making an oblique reference to a cold-blooded murderer—and do not feel the ones which may be improper influenced the jury in its determination of guilt.

█ In the second stage, the prosecutor made other comments which Appellant takes as criticism. Those include telling a story involving a snake to illustrate that a person's nature doesn't change. The story told was more in the line of a fable, and the prosecutor immediately added he was not comparing Appellant to a snake. Appellant also complains of error when the prosecutor pointed to a postcard Appellant had sent the decedent. The front of the card depicted a gorilla with the caption, "Patience My Ass—I'm Gonna Kill Something"; the back contained a threat: "Try and leave you'll understand this card MORE 'dig' For REAL NO JOKE LOVE GENE." The prosecutor said "that's Wanda Jean Allen in a nutshell." Appellant's attorney objected to the comment, saying the prosecutor implied Appellant was an ape. The trial court overruled the objection, observing she did not take it that way. In light of the entire comment, neither do we.

█ Appellant also complains the prosecutor elicited sympathy for the decedent, making references to a fair trial or treatment for her. Lack of an objection aside, this Court has in the past held that similar comments did not warrant relief by this Court. *Castro v. State,* 745 P.2d 394, 402 (Okl.Cr. 1987), *cert. denied,* 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988) (asking the jury if the victim had any constitutional guarantees). *See also Shelton v. State,* 583 P.2d 1107, 1111 (Okl.Cr.1978).

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

In her seventh proposition of error, Appellant states she was denied effective assistance of counsel for several reasons. We shall address them in the order she has presented them.

█ She first asserts counsel was ineffective because he was not paid adequately. Trial counsel's affidavit states he had reached an agreement with Appellant and her family to provide representation for a certain fee, payable by arraignment. Counsel based his fee on the assumption he would be able to reach a plea arrangement with the prosecution. By arraignment, however, Appellant's family had paid him only $800, less than one-fifth the agreed-upon fee. Additionally, the affidavit states that after the fee agreement and before arraignment, counsel learned the prosecution would seek the death penalty against his client. Counsel was never paid more than $800 for his representa-

tion. His motion to withdraw was overruled by the trial court, who reportedly told him he should consider representation of Appellant as part of his ethical obligation to perform pro bono service.

The State responds Appellant has failed to show prejudice because her attorney was not fully paid, as she has cited no specific instances other than lack of an investigator where her lack of funds to pay counsel manifested itself in counsel's performance.[7] Appellant responds the lack of payment created a conflict of interest; as a result, prejudice must be presumed. We disagree.

We fear Appellant is confusing the hardship and possible due process violation against her attorney, *see State v. Lynch*, 796 P.2d 1150 (Okla.1990) with a conflict on her part. A due process violation on one person does not necessarily translate into a constitutional violation against another. We do not disagree with Appellant that the better course might have been to allow counsel to withdraw, or at least have counsel from the public defender's office appointed as lead counsel. And while her attorney undoubtedly experienced hardship as a result of her failure to pay him, and such hardship can be a reason for an attorney's refusing an appointment, or withdrawing from an arrangement he has already made, *see* 5 O.S.Supp. 1988, Ch. 1, App. 3–A, Rules 1.16(b)(2) and (3), and 6.2(b); it is also true an attorney should render pro bono service whenever possible. *See* 5 O.S.Supp.1988, Ch. 1, App. 3–A, Rule 6.1(a).

In his affidavit, counsel notes the financial hardship imposed upon him, but does not state a conflict existed as a result of that financial hardship. Appellant has presented us with no authority from any jurisdiction[8] holding that inability of a client to pay automatically creates a conflict of interest between the attorney and his client; and we simply refuse to assume an attorney in good standing in this state who has voluntarily undertaken an obligation to represent a client would fail to render the utmost service to that client based solely on a subsequent inability of the client to pay. This is especially true when the record does not support the allegation. Consequently, we find no conflict of interest.

Therefore, we will address whether Appellant was denied effective assistance of counsel based not only on whether counsel's performance was deficient, but also whether any deficient performance prejudiced Appellant. *Williamson v. State*, 812 P.2d 384, 411 (Okl. Cr.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

In addressing an ineffective assistance claim, this Court must indulge a strong presumption counsel's conduct falls within a wide range of professional assistance. *Williamson*, 812 P.2d at 411. The burden rests with Appellant to show there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* With these principles in mind, we shall address the specific instances set forth in Appellant's brief.

Appellant first complains her attorney did not interview people who had investigated the death of a woman the decedent had supposedly killed in Tulsa a decade earlier. Appellant claims the investigation would have turned up evidence she could use in her defense of self-defense. As we have determined the theory of self-defense was not a valid defense, based on Appellant's own testimony, Appellant cannot show harm in failing

---

7. That complaint, denial of an investigator at state expense, is addressed as a pre-trial issue, *supra*.

8. Cases cited by Appellant, *Commonwealth v. Sweeney*, 368 Pa.Super. 33, 533 A.2d 473 (1987) and *Commonwealth v. Scheps*, 361 Pa.Super. 566, 523 A.2d 363 (1987) do not avail her. In *Scheps*, the court dealt with an abuse of discretion that occurred when the court refused to allow an attorney to withdraw after a defendant clearly terminated the relationship with the attorney; *Sweeney* dealt with a situation that arises when an attorney who was hired to represent a defendant at trial was forced to represent the same client on appeal without further compensation. Even there, the gravamen of the case did not deal with a conflict of interest, but the abuse of discretion by the trial court in failing to appoint an appellate indigent defender when one was available, before the appeal was perfected.

to investigate evidence in support of that theory.

■ Appellant also claims counsel was incompetent because he did not investigate her life history to discover readily available mitigating evidence. Essentially, Appellant claims that evidence would have shown she had a troubled, delinquent childhood; a low intelligence quotient; and was struck in the head when she was twelve years old, raising the possibility of brain damage.

Appellant claims trial counsel could have uncovered all this evidence. We agree, as all this information would have been known by Appellant. Appellant has not presented this Court with sufficient reason why she did not inform her attorney at that time of these facts she now claims were essential to her defense. In other words, counsel could have obtained the information from Appellant, who did not see fit to apprise him of it before or during trial. We agree with a federal court's assessment that "[t]rial counsel cannot be ineffective for failing to raise claims as to which his client has neglected to supply the essential underlying facts when those facts are within the client's possession; clairvoyance is not required of effective trial counsel." *Dooley v. Petsock*, 816 F.2d 885, 890–91 (3d Cir.1987).

Additionally, we have examined the exhibits Appellant has presented in support of this section, and agree with the State several of the exhibits would have been more harmful than helpful. Appellant's mother testified Appellant did well in school. This contrasts with information in the exhibits Appellant had an IQ of 69, the upper limit of mental retardation. It also contrasts with information Appellant was expelled from school because she fought constantly and always carried a knife. The information also showed Appellant had assaulted other people, including a relative and a foster parent. In light of this information, Appellant cannot show prejudice because her counsel failed to independently find this information. *Williamson*, 812 P.2d at 411.

In light of these findings, we find no merit to this claim, nor to the request we resubmit the case to the district court for an evidentiary hearing.

## VI. ISSUES RELATING TO PUNISHMENT

### A.

In her third proposition of error, Appellant claims the court improperly allowed hearsay evidence in the form of Det. Steve Pacheco of the Oklahoma City Police Department, who testified about the 1981 killing of Detra Pettus. That killing formed the basis of the aggravating circumstances found against her. Pacheco gave several details of the Pettus homicide.

■ We initially disagree with Appellant's statement the detective did not establish where he obtained the information to which he testified. The detective plainly testified he was involved in the Pettus homicide investigation, and in fact took Appellant's statement following that homicide. Appellant's trial counsel objected on similar grounds, but withdrew the objection when this fact was pointed out to him, a fact Appellant admits in her reply brief. She has therefore waived all but fundamental error. Further, there is a presumption of regularity in the trial court proceedings, *Huntley v. State*, 750 P.2d 1134, 1136 (Okl.Cr.1988); *Tuggle v. Page*, 427 P.2d 439, 441 (Okl.Cr. 1967), and Appellant has failed to provide any evidence to rebut the presumption, providing only the barest speculation the detective did not have personal knowledge of the events to which he testified. However, the record proves the speculation is without merit.

■ Certain items were not covered in Appellant's statement: the fact Appellant and Pettus took a trip to Arkansas together the year before; that Pettus was not armed; and that no gun was found in a dumpster where Appellant said she had placed it. Assuming these are not statements Appellant made to the detective at the time of the investigation, we do not view their admission as fundamental error. In her 1981 statement made after the Pettus homicide, Appellant said she was at the motel to talk to her friends, and mentioned Pettus' boyfriend, Russell Hodges, in the same sentence. In

that vein, the statement Appellant and Pettus took a trip to Arkansas together was not offered to prove they in fact made the trip, but that they were friends. It was therefore not hearsay. 12 O.S.1981, § 2801(3).

■ Likewise, the detective's statement no gun was found in the dumpster was not offered to prove no gun was found. In her 1981 statement she told the detective she had placed the gun in the dumpster, just as she did in making her 1988 statement. This was offered to prove she gave the same story to authorities in 1981 as she did in 1988. Whether a gun was found is of no real consequence. In her statement, Appellant stated Hodges shot at her, and when Appellant fired at him, Pettus fell. We think a reasonable person reading the 1981 statement would draw the inference Pettus did not have a pistol; however, even if this were to be considered hearsay, we do not feel its admission prejudiced Appellant. Whether Pettus was armed or not, she did not fire at Appellant; and Appellant saw her fall to the ground after she fired at Hodges.

■ On a broader scale, we believe the complained-of testimony is not hearsay for another reason. The testimony was not offered to prove Pettus was unarmed, a friend of Appellant's, or that a gun was not found in a dumpster. *See* 12 O.S.1981, § 2801(3). The evidence was offered to show similarities between Appellant's actions in killing Pettus and her actions in killing the decedent in this case. Appellant told each interrogator she threw the pistol in a dumpster; each victim was killed with a .38 caliber weapon; Appellant knew each victim, whether close friends or not; and both killings arose out of an argument. Any error that arose out of the complained-of remarks was harmless beyond a reasonable doubt. *Byrd v. State*, 657 P.2d 183, 187 (Okl.Cr.1983).

### B.

■ Appellant complains in her fifteenth proposition the trial court erred in failing to follow the procedure established in *Brewer v. State*, 650 P.2d 54, 63 (Okl.Cr.1982). There, we held defense counsel should be given the opportunity to stipulate to a past conviction involving the use or threat of violence.

This Court held in *Smith v. State*, 819 P.2d 270 (Okl.Cr.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2312, 119 L.Ed.2d 232 (1992), that when the State additionally must prove the defendant has committed acts indicating he would be a continuing threat to society, the restraints in *Brewer* are not applicable. As this Court said in rejecting the notion a stipulation would suffice when such a circumstance existed:

> Relying upon bare stipulations could result in erroneous findings of continuing threat. Requiring the defendant to refute the implication of a threat to society would amount to a shift in the burden of proof onto the defendant's shoulders to prove the *absence* of the aggravating circumstance. These are the very considerations that compelled the decision in *Brewer*. They also compel the decision that when the State alleges the continuing threat circumstance, it must not only be permitted but *required* to present evidence that the defendant's behavior demonstrated a threat to society, and a probability that the threat would continue to exist in the future.

*Smith*, 819 P.2d at 277–78 (emphasis in original).

Therefore, this complaint is without merit.

### C.

■ Appellant complains in her seventeenth proposition her sentence should be reversed because the prosecution relied upon the same evidence to support both the aggravating circumstance of continuing threat and that of having a prior felony conviction involving the use or threat of force or violence to the person.

This Court has previously addressed this identical situation, observing that although the state did rely upon an appellant's prior convictions to support each aggravating circumstance, the convictions were not used to show the same aspect of an appellant or his crime.

The circumstance of prior violent felonies shows the aspect of a defendant as a violent and incorrigible person whose pres-

ent act, viewed in conjunction with his past conduct, can be appropriately punished only by imposing the ultimate sanction. On the other hand, the continuing threat circumstance goes to the aspect of the need for protection of society from the defendant's probable future conduct. Although the jury must of necessity consider the defendant's past conduct in arriving at its prediction, this does not make his past and future aspects the same.

*Smith v. State,* 819 P.2d 270, 278 (Okl.Cr. 1991), *cert. denied,* — U.S. ——, 112 S.Ct. 2312, 119 L.Ed.2d 232 (1992). *See also Green v. State,* 713 P.2d 1032, 1040 (Okl.Cr. 1985); *Funchess v. Wainwright,* 772 F.2d 683, 692 (11th Cir.1985).

Here, the two do not overlap. In addition to the prior violent felony conviction, the prosecution also re-introduced the first-stage evidence into the sentencing proceedings to support the aggravating circumstance of continuing threat. This proposition is without merit.

### D.

■■■ Appellant next complains the "continuing threat" aggravating circumstance is unconstitutionally vague. This Court has repeatedly rejected that challenge, *see Williamson v. State,* 812 P.2d 384, 410 (Okl.Cr. 1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992), and Appellant has not cited additional authority in support her eighteenth proposition of error. It is therefore denied.

### E.

Appellant next contends the court gave an improper instruction dealing with Oklahoma Uniform Jury Instruction—Criminal (OUJI–CR) 440. She claims in this nineteenth proposition of error the instruction misstates the law. We disagree.

■■■ The instruction reads:

If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more miti-

gating circumstances, the death penalty shall not be imposed.

OUJI–CR 440. Appellant compares this instruction to the statute, arguing that it should be interpreted to read the jury cannot impose the death sentence unless it finds the totality of the evidence in mitigation does not outweigh each aggravating circumstance individually. In other words, he argues each aggravating circumstance must stand alone against the totality of the mitigating circumstances; and if any one aggravating circumstance is outweighed in such a manner, the jury cannot impose the death penalty based on that aggravator.

This "divide and conquer" construction is not supported by the statute itself. The statute, 21 O.S.Supp.1987, § 701.11, reads in pertinent part: "Unless at least one of the statutory aggravating circumstances enumerated in this act is so found or if it is found that any such aggravating circumstance is outweighed by the finding of one or more mitigating circumstances, the death penalty shall not be imposed." Clearly, the singular "aggravating circumstance" in the phrase "any such aggravating circumstance" refers back to the first reference, "*at least one* of the statutory aggravating *circumstances.*" We read no requirement that each aggravating circumstance must on its own stand against the totality of the mitigating circumstances. This is supported by 21 O.S.1981, § 701.10(C), concerning general sentencing proceedings, where evidence may be presented "as to any mitigating circumstances or as to any of the aggravating circumstances enumerated in Section 701.7 et seq. of this title." Under this section, all evidence in mitigation is presented, along with all evidence in aggravation. This Court has held that specific standards for balancing aggravating circumstances against mitigating circumstances are not constitutionally required. *Sellers v. State,* 809 P.2d 676, 691 (Okl.Cr.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991). This instruction is one which assists the jury in balancing reasons a defendant deserves to live against reasons she should die and is not one involving concrete determinations of facts that establish guilt. *See id.; see also* OUJI–CR 438.

Additionally, to place the construction Appellant urges would prohibit this Court from utilizing its authority to reweigh aggravating and mitigating circumstances should one aggravator be found to be invalid, *see* 21 O.S. 1991, § 701.13(E); *Dutton v. Dixon,* 757 P.2d 376, 378 (Okl.Cr.1988), as we would have no way of knowing those situations where a jury may have found the existence of two aggravating circumstances, yet determined the totality of mitigating circumstances outweighed one aggravator but not the other. We do not believe the Legislature in one instance would give this Court the authority to reweigh aggravating and mitigating circumstances, then allow a statute which by its operation would deprive this Court of that very authority.

This assignment of error is without merit.

### F.

Appellant in her twentieth proposition contends the trial court erred in allowing evidence of aggravation without first giving her proper notice of it. She complains of evidence she and Detra Pettus, the victim of the 1981 homicide, were friends who had taken a trip to Arkansas together. She does not claim the prosecution did not inform her evidence of the Pettus homicide would be used. This Court addressed a similar complaint in *Williamson v. State,* 812 P.2d 384 (Okl.Cr.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992). There, we held the purpose of notification was to allow a defendant time to present a defense or an explanation for the conduct. *Id.* at 408. Here, the State filed notice of an open file policy (O.R. 81), indicating the information was available to Appellant. Additionally, this Court has held that "the State is not required to give a detailed description of the evidence that will be offered in order to meet the statutory notice of section 701.10." *Id.* (citing *Wilson v. State,* 756 P.2d 1240, 1245 (Okl.Cr.1988)). Prosecutors informed Appellant details of the Pettus homicide would be presented in aggravation. We view this as sufficient in this case.

### G.

Appellant next alleges the court improperly instructed the jurors that, although they

must consider aggravating circumstances, they were permitted to ignore mitigating evidence altogether. The language he complains of is found at OUJI–CR 438.

We rejected this argument in *Williamson,* 812 P.2d at 409. We do so again.

### H.

Likewise without merit is Appellant's twenty-second proposition, the court improperly instructed the jury in the manner in which they were to weigh aggravating and mitigating circumstances. She acknowledges the jury was instructed it had to find the presence of aggravating circumstances beyond a reasonable doubt, but complains the jury was told it could authorize the death penalty if it determined evidence in aggravation outweighed mitigating evidence. We have consistently rejected and continue to reject this argument. *Williamson,* 812 P.2d at 410 and cases cited therein.

### I.

In the same manner we have rejected her twenty-third argument, that the trial court should have instructed the jury it had the option to return a life sentence regardless of its findings concerning aggravating and mitigating circumstances. *Id.*

### J.

Appellant next contends her death sentence should be vacated because the court instructed the jury to determine punishment for the offense of felonious possession of a firearm in the same punishment stage. We initially note Appellant failed to object to the procedure or instructions at trial, and has thus waived all but fundamental error. *Id.* at 409.

Appellant directs our attention to the death sentence for the murder only. We note in that regard she was charged in the first stage with carrying a loaded firearm. The information claims a violation of 21 O.S.Supp.1983, § 1283. This Court has held the better practice is to hold a bifurcated trial when a defendant violates the Oklahoma Firearms Act, which Appellant here did. *See*

21 O.S.1981, § 1289.13; *Cooper v. State*, 765 P.2d 1211, 1213–14 (Okl.Cr.1988). This practice applicable at the time of the trial[9] afforded a defendant greater protection. Therefore, the trial court was correct in following the law set forth by this Court, and we cannot see how deliberation on the firearms charge in any way prejudiced the jury to inflict the death penalty.

■■■ This Court notes, however, that the conviction for the firearms charge must be reversed and remanded for a new trial. Although the trial court used the correct procedure, it failed to properly instruct the jury at the end of the first stage. The court instructed the jury on simple possession of a firearm, telling them the elements were (1) knowingly; (2) possessing; (3) any pistol; (4) such possession was wilful; (5) in Oklahoma County, Oklahoma (O.R. 174). This instruction does not apprise the jury of a crime in the state of Oklahoma. It is the carrying of a loaded firearm in a vehicle, *see* 21 O.S.1981, § 1289.13, or carrying any firearm after conviction of a felony, *see* 21 O.S.Supp.1983, § 1283, that makes the act a crime. *Cooper*, 765 P.2d at 1213–14. Omission of these elements makes reversal necessary. *See Hackett v. State*, 751 P.2d 761, 763 (Okl.Cr.1988) (omitting elements of "assault and battery" and "intent to kill" from instruction defining elements of crime of assault and battery with a deadly weapon constituted reversible error).

Therefore, the conviction for Feloniously Carrying a Firearm must be REVERSED and REMANDED for a new trial. Appellant's twenty-fourth proposition is otherwise without merit.

### K.

In her last proposition, Appellant claims the court erred in failing to instruction the jury on the "presumption of life." This argument has been considered and rejected by this Court before. *Duvall v. State*, 825 P.2d 621, 633–34 (Okl.Cr.1991). We do so again.

## VII. MANDATORY SENTENCE REVIEW

This Court is required by 21 O.S.1991, § 701.13(C) to determine whether (1) the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances as enumerated in 21 O.S. 1981, § 701.12. Pursuant to this mandate and in response to Appellant's sixteenth proposition of error, we shall first determine whether the evidence was sufficient to support the imposition of the death penalty.

■■■ Appellant asserts the evidence is insufficient both to show she posed a continuing threat to society (21 O.S.1981, § 701.-12(7), and that she had previously been convicted of a felony involving the use or threat of violence to the person (21 O.S.1981, § 701.-12(1)). The prosecution incorporated first-stage evidence, as well as presenting additional evidence in support of the aggravating circumstances. In addition to the evidence set forth earlier in this opinion, second-stage evidence showed Appellant had been convicted of first degree manslaughter in 1981 as a result of the death of Detra Pettus. Taken in the light most favorable to the prosecution, we find the evidence sufficient. Evidence concerning the prior manslaughter conviction showed Appellant was confronted with the threat of violence, left the area, returned with a pistol, pistol whipped the decedent, shot her in the abdomen, then told police she threw the weapon in a dumpster. That confrontation arose from a verbal disagreement, which escalated at least in part as a result of Appellant's conduct. The autopsy showed that decedent died as a result of a contact wound, indicating the weapon was fired from close range. As a result of this death, Appellant was convicted after pleading guilty to first degree manslaughter. Evidence of that

---

9. This was the procedure at the time of trial. *Cooper* has since been overruled. *Compare Williams v. State*, 794 P.2d 759, 761 (Okl.Cr. 1990) (holding an accused is not entitled to a bifurcated trial when the former conviction is an essential element of the firearms charge) *with*

*Booker T. Chapple v. State*, 866 P.2d 1213, 64 O.B.J. 2606 (Okl.Cr.8–27–93) (holding that when a defendant is charged with a charge of felonious possession of a firearm and another felony, after conviction of a felony, the firearms charge shall be tried during the second stage of proceedings).

homicide can be combined with evidence from this trial which showed Appellant got into an argument with the decedent; followed her when she tried to leave the household and terminate the relationship; approached her at the police station, where she fired a shot into the decedent's abdomen; then fled, attempting to hide the weapon by giving it to an acquaintance. Before the shooting, Appellant had written cards and letters to the decedent, threatening her with violence if she tried to leave. After she was arrested, she told police she had thrown the pistol into a dumpster behind a nearby business. The same day she shot the decedent, she called the decedent's son and said she would not rest until the decedent was dead. We believe this evidence supports both the aggravating circumstance that Appellant constitutes a continuing threat, *Battenfield v. State*, 816 P.2d 555, 566 (Okl.Cr.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992); *Williamson v. State*, 812 P.2d 384, 406 (Okl.Cr.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992); and that she had previously been convicted of a felony involving the use or threat of force to the person. *Smith v. State*, 819 P.2d 270, 278 (Okl.Cr.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2312, 119 L.Ed.2d 232 (1992); *Smith v. State*, 737 P.2d 1206, 1214–15 (Okl.Cr.1987), *cert. denied*, 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987).

■ The prosecution initially alleged three aggravating circumstances: that Appellant had been convicted of a felony involving the use or threat of violence; she posed a continuing threat to society; and the murder was committed to avoid lawful arrest or prosecution. As mitigation Appellant presented evidence showing she had a good relationship with her family; the circumstances of the crime did not warrant the death penalty; the relationship between Appellant and the decedent; her good work habits; her mental state at the time of the crime; her nature and personality; her chances of rehabilitation; her age; her fear of the victim and the victim's prior conduct of violence; her care for other human beings; her good conduct in the penitentiary; her showing of remorse; no prior criminal record except the one man-

slaughter conviction; she suffered emotional deprivation as a result of her childhood upbringing; the crime was committed in the heat of passion and she was emotionally unstable; treatment would be beneficial; the crime was not particularly heinous. The jury found the existence of the two aggravating circumstances discussed above, while declining to find she committed the murder to avoid arrest or prosecution.

Reviewing the evidence in mitigation and aggravation, we find the sentence of death to be factually substantiated and appropriate.

Finding no error warranting reversal or modification, the judgment and sentence for Murder in the First Degree is AFFIRMED. For the reasons stated above, we REVERSE and REMAND for a new trial the conviction for Felonious Possession of a Firearm.

JOHNSON, V.P.J., and STRUBHAR, J., concur.

CHAPEL, J., concurs in result.

LANE, J., dissents.

LANE, Judge, dissenting.

I must respectfully dissent to that part of the majority opinion which addresses the many facets of self-defense raised in this case.

That appellant shot and killed Gloria Leathers was not contested at trial. Of utmost importance to the appellant was her theory of self-defense. So important was this defense, she assumed the risk of cross-examination and exposure of her violent history to take the stand and present evidence necessary to raise it. The trial judge was satisfied she presented sufficient evidence to raise the defense and so instructed the jury. The record supports this discretionary determination. What the trial court did not do, and which requires reversal in this case, is instruct the jury that once the defense of self-defense is raised the State bears the burden to disprove it beyond a reasonable doubt. *See* OUJI–CR 745; *West v. State*, 798 P.2d 1083 (Okl.Cr.1990).

Imposing itself as the trier of fact the majority substitutes proper appellate review

with a "we don't believe her" standard. Arguing its own factual spin the majority goes so far as announcing the trial court erred by finding the defendant put on enough evidence to take her theory of self defense to the jury. The simple truth is the record supports the trial court's decision that the defendant raised the theory of self defense. Thus, the trial court did not abuse its discretion by so instructing the jury. Whether the appellate court believes, or indeed whether the jury ultimately *would have* believed the defense is of no analytical consequence. What does matter is whether the proper trial consequences flowed from the undeniable fact the appellant successfully raised the issue of self-defense. Unfortunately they did not.

The majority summarily dismisses a number of alleged errors stating self-defense was not raised in this case. Since the defense plainly was raised, I must dissent from the majority's treatment of these issues as well.

The most serious error is the failure of the trial court to instruct on the State's shifting burden. This error requires reversal and remand to the district court for new trial.

I also take exception to the majority finding the evidence the appellant was the "man" in her lesbian relationship has any probative value at all. Were this a case involving a heterosexual couple, the fact that a male defendant was the "man" in the relationship likewise would tell me nothing. I find no proper purpose for this evidence, and believe its only purpose was to present the defendant as less sympathetic to the jury than the victim.