2004 OK CR 1

**Jimmy Dean HARRIS, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2001–1268.**

Court of Criminal Appeals of Oklahoma.

Jan. 7, 2004.

As Corrected Feb. 5, 2004.

732

Catherine Hammarsten, Mitch Solomon, Assistant Public Defenders, Oklahoma City, Ok, attorneys for defendant at trial.

Pattye High, Connie Pope, Assistant District Attorneys, Oklahoma City, Ok, attorneys for the state at trial.

Carolyn L. Merritt, Assistant Public Defender, Oklahoma City, Ok, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Brant M. Elmore, Assistant Attorney General, Oklahoma City, Ok, attorneys for the state on appeal.

## OPINION

JOHNSON, Presiding Judge:

¶ 1 Appellant, Jimmy Dean Harris, was charged in Oklahoma County District Court, Case No. CF–1999–5071, with Count 1: First–Degree Murder (21 O.S.Supp.1998, § 701.7(A)); Count 2: Shooting with Intent to Kill (21 O.S.Supp.1999, § 652); and Count 3: Assault and Battery with a Dangerous Weapon (21 O.S.Supp.1999, § 645). The State filed a Bill of Particulars seeking a sentence of death with regard to Count 1, alleging (1) that Appellant knowingly created a great risk of death to more than one person, and (2) that Appellant constituted a continuing threat to society. *See* 21 O.S.1991, § 701.7(2), (7). Jury trial was held August 22 through September 26, 2001, before the Honorable Virgil C. Black, District Judge. The jury found Appellant guilty as charged on all counts, found that Appellant knowingly created a great risk of death to more than one person, rejected the claim that Appellant posed a continuing threat to society, and recommended a sentence of death on Count 1, life in prison on Count 2, and ten years imprisonment on Count 3.[1] On October 23, 2001, the trial court sentenced Appellant in accordance with the jury's recommendation. Appellant timely lodged this appeal.

## FACTS

¶ 2 The long-running domestic problems between Appellant and his wife, Pamela Harris,[2] culminated on the morning of September 1, 1999, when Appellant entered Mrs. Harris's workplace, shot and killed her employer, Merle Taylor, and seriously injured Mrs. Harris herself. The evidence at trial showed that Appellant and Mrs. Harris had been involved in a tumultuous relationship for about twenty years, and married for the last ten.

¶ 3 Both Appellant and his wife had years of experience in the automobile transmission business. Appellant was a transmission mechanic by trade, and Mrs. Harris had experience in dealing with customers and ordering parts. Through the years, the two often worked together at various transmission shops in several states. In 1998, Mrs. Harris obtained a job at an AAMCO transmission shop in Oklahoma City, owned and operated by Merle Taylor. Appellant was not able to obtain satisfactory employment in Oklahoma City, and worked for a time at a shop in Texas, driving home on the weekends. Although Appellant testified that he worked in Texas because he could make better money there than in Oklahoma City, other evidence suggested Appellant was angry that Taylor would not hire him. Mrs. Harris testified that Taylor did not want to hire Appellant. Taylor was not unsympathetic to the couple's problems, however; in mid–1999, he offered his lake home to the Harrises so they could get away and try to work out their difficulties.

¶ 4 During an argument in mid-August 1999, Appellant made serious and specific threats of violence to Mrs. Harris. Having lost his last transmission job in Texas several months before, and unable or unwilling to obtain a new job, Appellant became increasingly resentful that his wife's boss would not hire him. Appellant threatened to kill his wife, her parents, their daughter, Mrs. Harris's coworkers, and Merle Taylor. Mrs. Harris took the threat seriously, especially after noticing that a .38 caliber handgun that Appellant kept hidden in the garage was no longer there. On or about August 15, 1999, Mrs. Harris left the home with their daughter Kristina; she subsequently obtained a protective order directing Appellant to leave the family home and filed for divorce. Be-

---

1. Punishment for Counts 2 and 3 was imposed at the end of the first stage of trial. The "second stage" or "punishment phase" referred to herein addressed punishment for the capital offense only. *See Perryman v. State*, 1999 OK CR 39, ¶ 14, 990 P.2d 900, 905 (outlining procedure for trial of capital and non-capital charges).

2. By the time of trial, Pam Harris had remarried and changed her last name to Schmidthuber. For the sake of clarity, she will be referred to as Mrs. Harris herein.

fore leaving the home, Appellant vandalized it, removing most furnishings, cutting and burning Mrs. Harris's clothing, burning holes in the carpet with cigarettes, and writing "Miss AAMCO" on the carpet several times with steak sauce. He then broke the house keys off inside the door locks, requiring Mrs. Harris to break down a door to regain entry. Mrs. Harris testified that on August 31, 1999, Appellant called her at the transmission shop and told her he was coming to kill her. A witness observed Appellant driving by the shop later that day.

¶ 5 On the morning of September 1, 1999, Appellant called Mrs. Harris's workplace several times, sometimes demanding to talk to her, other times hanging up unless she answered the phone. Appellant demanded that she give him access to a storage unit containing personal property he claimed was his. Mrs. Harris told him to call her lawyer. During these repeated calls, Appellant asked his wife if she "wanted to live to see another day"; said "You tell Merle I'll get him"; and told his wife, "You just wait." A short time after the telephone calls, Appellant drove his van to the transmission shop, walked in, and demanded to see Mrs. Harris, who was in the break room with Taylor's daughter-in-law, Jessica. Merle Taylor stepped between Appellant and Mrs. Harris and calmly asked Appellant to leave. Appellant then pulled the revolver out of his pants, raised it up, pushed Taylor to the ground, lowered the gun, and shot Taylor twice at close range. Taylor died at the scene. Appellant then chased and shot at Mrs. Harris with the bullets remaining in the six-shot firearm. One bullet hit her hip and traveled through internal organs to her sternum. When the gun would no longer fire, Appellant pistol-whipped his wife repeatedly in the head. Appellant apparently tried to reload the gun, because the spent shells had been manually removed and left on the shop floor, along with extra bullets that Appellant had brought. Appellant then fled the scene, disposed of the gun, abandoned his van, and hid in a friend's garage where police found him the next day.

¶ 6 In addition to the testimony of Pam Harris and numerous co-workers who witnessed the shootings, the State presented evidence that Appellant had been physically and verbally abusive to his wife throughout their twenty-year relationship. In his defense, Appellant presented evidence that a combination of low intelligence, mental illness, and substance abuse prevented him, at the time of the shootings, from being able to form a specific intent to kill either Pam Harris or Merle Taylor. Appellant himself testified in the guilt phase of the trial. He and other witnesses presented testimony about his chronic use of marijuana, his occasional recreational use of Valium, and his depression and intoxication on beer and drugs in the two weeks between his wife leaving him and his taking a loaded firearm to the transmission shop. Appellant claimed that on the morning of the shootings, he had ingested approximately five beers and four or five tablets of Valium. Appellant also presented expert testimony about his general psychological makeup, including relatively low I.Q. scores and possible bipolar disorder. In rebuttal, the State presented its own expert psychological testimony about Appellant's personality disorders, essentially concluding that Appellant exhibited some psychopathic tendencies and appeared to be feigning mental and emotional problems since his arrest.

¶ 7 During the capital punishment phase of the trial, after incorporating all of the guilt-phase evidence, the State presented evidence that Appellant had resisted a prior arrest and that he had assaulted a jailer while awaiting trial in this case. The State also presented victim-impact testimony from Merle Taylor's widow and one of his sons. Besides testimony from Appellant's family, pleading that his life be spared, the defense presented evidence about Appellant's poor home environment as a child, certain experiences in his past that traumatized him, and evidence that his mental illness could be adequately controlled in prison. Additional facts will be presented as relevant to the propositions of error.

## I. MOTION FOR MISTRIAL

■ ¶ 8 Jury trial in this case began August 22, 2001. Ten days into the trial, on

September 11, 2001, radical Muslim terrorists hijacked four commercial airliners, crashed two of them into the World Trade Center in New York City, flew a third into the Pentagon, and crashed the fourth in Pennsylvania. Thousands of people were killed. The enormity of these attacks created a national emergency. In Proposition 1, Appellant contends that the trial court's refusal to adjourn for a few days or declare a mistrial when these events unfolded denied him a fair trial. We disagree.

¶ 9 Appellant contends that the seriousness of the terrorist events must have either distracted the jury from giving full attention to his case, or else prejudiced the jury against him. An accused is entitled to be tried by a jury free from outside influences which could affect the fairness of the proceeding. U.S. Const. Amends. VI, XIV; Okla. Const. art. II, § 20. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). He is not, however, entitled to jurors ignorant of the offense for which the defendant is on trial; and he is certainly not entitled to jurors ignorant of other events taking place in the world around them.

¶ 10 Appellant offers no evidence that the terrorist events either distracted the jurors from the evidence being presented in his trial, or prejudiced them in any way against the defense.[3] Appellant's claim that the jurors likely identified his case with the terrorist acts because both involved "a sudden and unexpected attack on people in the workplace" is unconvincing. Even the sketchy information available in the days immediately following the attacks was enough to markedly distinguish those acts from the crimes at issue here. Appellant is neither Arab nor Muslim, and unlike the terrorist attacks, Appellant's crimes had absolutely no religious or political dimension to them. As Appellant's trial resumed on the morning of September 11, the trial court asked jurors whether the unfolding national events would prejudice them against Appellant, or affect their ability to fairly and fully evaluate the evidence in Appellant's trial. Defense counsel actually helped the court formulate the question. No juror expressed any concern. The trial court did not abuse its discretion in refusing to grant either a continuance or a mistrial. *Tate v. State*, 1995 OK CR 24, ¶ 20, 896 P.2d 1182, 1188. Appellant offers no additional evidence on appeal which would cast doubt on the trial court's decision. *See Nichols v. Jackson*, 2001 OK CR 35, ¶ 18, 38 P.3d 228, 233 (prejudice from juror exposure to adverse publicity must be shown by clear and convincing evidence).[4] Proposition 1 is denied.

3. Although he does not squarely contend that the trial court's refusal to adjourn for a few days or declare a mistrial denied his right to confront witnesses or present a defense, Appellant does mention the fact that the temporary ban on air travel posed problems for getting two guilt-stage defense witnesses to trial as scheduled. However, the trial court arranged to have the witnesses testify by two-way video-conferencing system from a Houston law firm. The trial proceedings were temporarily moved to the Oklahoma Bar Center, which was equipped for this purpose. The trial court's solution was resourceful and reasonable, and we find no evidence to support Appellant's claim that he was somehow "forced" to agree to this procedure. To the contrary, the record shows that defense counsel elected not to use compulsory process to obtain the Texas witnesses' attendance via car or bus, and chose instead to arrange for the video presentation. Nor do we perceive any way in which video presentation of these two defense witnesses might have prejudiced Appellant. Of the ten defense witnesses presented in the guilt stage, the two who testified by video were former employers of the Harrises who gave background on

their employment history and how their relationship appeared at the time. Appellant also briefly mentions "other extraneous influences" on the jury which, he argues, contributed to the error complained of here, including (1) excusal of two of the original jurors, one for medical problems, the other for work-related problems; (2) an adjournment due to the death of one of the prosecutors' fathers; and (3) a front-page article on domestic violence which ran in the local newspaper shortly after trial began. As Appellant offers neither evidence nor legal authority to demonstrate how these events prejudiced the jury against him, we will not consider them. Rule 3.5(C), *Rules of the Court of Criminal Appeals*, 22 O.S.2001, Ch. 18, App.

4. We reject Appellant's suggestion that prejudice to the accused is presumed under the facts presented here. Appellant's reliance on *Sheppard v. Maxwell* for this assertion is misplaced. *Sheppard* involved intense publicity about *the defendant's own case*, including, among other things, a recorded and televised confession. The Supreme Court held that actual unfairness in the trial proceedings need not be conclusively demon-

## II. JURY SELECTION ISSUES

 ¶ 11 Appellant contends he was denied a fair and impartial jury in several ways during jury selection. At the outset, we stress that issues regarding jury selection are generally reviewed only for an abuse of discretion. Just as we accord great deference to jurors' determinations of witness credibility, due to jurors' unique ability to personally observe the demeanor of witnesses, we also give great deference to trial judges in matters regarding jury selection. The trial judge personally conducts *voir dire,* observing all aspects of the participants' demeanor that are not reflected in the printed transcript. *See Patton v. State,* 1998 OK CR 66, ¶ 16, 973 P.2d 270, 281–82; *Ledbetter v. State,* 1997 OK CR 5, ¶ 4, 933 P.2d 880, 885.

¶ 12 In Proposition 7, Appellant claims the trial court erred in refusing to remove two prospective jurors, Ms. Grimes and Ms. Brown, for cause. Defense counsel used her last peremptory challenge to strike Ms. Grimes, and asked for an additional peremptory to strike Ms. Brown, which was denied, leaving Ms. Brown on the jury. This, he claims, was sufficient to preserve any error in the trial court's refusal to remove Ms. Grimes for cause. *See Ross v. Oklahoma,* 487 U.S. 81, 83–84, 108 S.Ct. 2273, 2276, 101 L.Ed.2d 80 (1988); *Salazar v. State,* 1996 OK CR 25, ¶ 28, 919 P.2d 1120, 1128. However, the record shows that the day before striking Ms. Grimes, and seeking an additional challenge to remove Ms. Brown, defense counsel voiced no objections to Ms. Brown's fitness and passed her for cause.

 ¶ 13 Appellant was certainly entitled to a fair trial before an impartial jury. U.S. Const. Amend. VI; Okl. Const. art. II, § 20. Generally, when a defendant fails to challenge a prospective juror for cause, he waives any subsequent claim regarding the fitness of that panelist to serve on the jury. *Wood v. State,* 1998 OK CR 19, ¶ 30, 959 P.2d 1, 9. The issue here is complicated by the fact that Appellant used his last peremptory challenge to remove someone he had, in fact, challenged for cause. Assuming that a trial court's refusal to grant a particular challenge for cause was in fact error, the fact that the defendant was compelled to use his last peremptory challenge to "correct" that error does not, itself, amount to a denial of the federal constitutional right to an impartial jury. *See United States v. Martinez Salazar,* 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000); *Ross,* 487 U.S. at 88–89, 108 S.Ct. at 2278–79; *Johnson v. Gibson,* 254 F.3d 1155, 1160 (10th Cir.2001).

¶ 14 Nevertheless, in addition to arguing that his jury was not, in fact, impartial, because Ms. Brown should also have been excused for cause (even though he did not challenge her for cause), Appellant contends that by having to use his last peremptory challenge to "correct" the court's error with regard to Ms. Grimes, he was denied his statutory entitlement to a full complement of nine peremptory challenges to use as he pleased. *See* 22 O.S.2001, §§ 654–55. We first determine whether the trial court abused its discretion in refusing to remove Ms. Grimes for cause at defense counsel's request. If it did not, then Appellant was not "forced" to "correct" any error by the trial court, and his decision to strike Ms. Grimes instead of Ms. Brown becomes a strategic one.

 ¶ 15 Ms. Grimes stated that both she and her sister had experienced domestic abuse. She also had a friend who was killed by her boyfriend in a domestic incident; the boyfriend was convicted and sentenced, although Ms. Grimes did not attend the trial. Ms. Grimes' own domestic abuse took place in a previous marriage and lasted about two years. Ms. Grimes also told the court that her son had been molested by a family friend, and that the perpetrator had been prosecuted, convicted, and sentenced to prison. Despite these experiences, Ms. Grimes assured the trial court that she could "listen to every bit of evidence" and make a fair

strated when "television has exposed the community repeatedly and in depth to the spectacle of [the accused] personally confessing in detail to the crimes with which he was later to be charged." *Sheppard,* 384 U.S. at 351–52, 86

S.Ct. at 1516 (citations omitted). Appellant offers no authority for extending this reasoning to cases where intense media attention was given to unrelated crimes committed by someone other than the accused.

judgment according to the law. Comparing her own experiences and the instant case, she said, would be like comparing "apples and oranges." When asked why she thought she would be a good juror, Ms. Grimes explained that, given her experiences, she felt her "input could be something that could be helpful."

¶ 16 Ms. Grimes did not express any unwillingness to consider all available punishment options, nor did she express any prejudice against Appellant or in favor of the prosecution in this case. Rather, Appellant's argument is that given her past experiences, Ms. Grimes simply could not be fair to him, despite her assurances to the contrary. *See* 22 O.S.2001, § 659(2).[5]

¶ 17 We believe Juror Grimes' candor about her past experiences is just as important as the experiences themselves in determining whether she was biased. The fact that she had past experiences somewhat similar to some of the evidence in this case did not automatically disqualify her from serving as a juror.[6] *See Gonzales v. Thomas*, 99 F.3d 978 (10th Cir.1996); *Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir.1990), *cert. denied*, 498 U.S. 1091, 111 S.Ct. 974, 112 L.Ed.2d 1059 (1991). There is no suggestion that Ms. Grimes withheld relevant information or misled the court during the *voir dire* process.

¶ 18 We are left, then, with judging the credibility of Ms. Grimes' promises to be fair and impartial—and that credibility choice is, of course, one which the trial court is much better suited to make. The trial court did not abuse its discretion in refusing to strike Ms. Grimes for cause.[7] *Richie v. State*, 1995 OK CR 67, ¶¶ 9–11, 908 P.2d 268, 273. Consequently, Appellant was not "forced" to keep Ms. Brown, however unacceptable she might have been. *Hawkins v. State*, 1986 OK CR 58, ¶ 6, 717 P.2d 1156, 1158. Appellant's decision to peremptorily strike Ms. Grimes and keep Ms. Brown did not deprive him of any constitutional or statutory right. Proposition 7 is denied.

¶ 19 In Proposition 8, Appellant claims that on four different occasions, the prosecutor used a peremptory challenge to remove a minority juror from the panel, and that the removal was racially motivated, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *Batson* establishes a three-part inquiry. First, the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. If he does so, the burden shifts to the prosecutor to articulate a clear, reasonably specific, and race-neutral explanation related to the case for striking the juror in question. The explanation need not be persuasive, or

---

5. This section defines "actual bias" as "the existence of a state of mind on the part of the juror, in reference to the case, or to either party, which satisfies the court, in the exercise of a sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging."

6. Appellant contends Ms. Grimes' experiences were "identical" to the allegations in this case. We do not perceive as many parallels as Appellant does. While it is true that the State introduced evidence of Appellant's domestic abuse toward his wife in the guilt phase of trial, Appellant never denied committing the acts with which he was charged. Appellant was charged with beating his wife with a pistol, shooting her with the intent to kill her, and intentionally murdering Mr. Taylor. Appellant testified that he meant to beat his wife, that he meant to shoot her but not kill her, and that his shooting of Mr. Taylor was merely an accident that occurred while he was angry and intoxicated. As Appellant maintained at trial and on appeal, the only real controversy was over his intent.

7. In arguing that the trial court abused its discretion regarding Ms. Grimes, Appellant points to several other prospective jurors who were excused for cause due to personal experiences. Even assuming such comparisons are appropriate, we find significant differences between the excused panelists and Ms. Grimes. One panelist candidly told the court that her own experience as a battered wife would, in fact, prevent her from fairly judging Appellant's fate. Another panelist said that considering his own personal experiences, a case involving domestic abuse would be "really tough" for him. A third panelist became emotional as he tried to describe his own abuse at the hands of his mother's boyfriend; he was summarily excused. Each of these panelists not only had experiences at least arguably related to those in this trial, but they also expressed difficulty with those experiences and/or their relation to Appellant's case. Ms. Grimes did not.

even necessarily plausible; it simply must be race-neutral. Once the prosecutor offers a race-neutral reason, the trial court must then determine whether the defendant has met his burden of proving purposeful discrimination. The reason given will be deemed race-neutral unless a discriminatory intent is inherent in the prosecutor's explanation. *See Purkett v. Elem*, 514 U.S. 765, 767–69, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995); *Black v. State*, 2001 OK CR 5, ¶ 31, 21 P.3d 1047, 1061. We review a trial court's decision on this issue only for an abuse of discretion. The trial court has the unique benefit of being able to personally assess the demeanor of the prosecutor making the challenge. *Bland v. State*, 2000 OK CR 11, ¶ 14, 4 P.3d 702, 711.[8]

■ ¶ 20 The four prospective jurors at issue here were Mr. Crittenden, Ms. King, Mr. Cobb, and Ms. Gray. The prosecutor claimed she was striking Mr. Crittenden because he was unable to say he could impose the death penalty. For the same reason, the prosecutor unsuccessfully tried several times to have the trial court remove Mr. Crittenden for cause. Appellant claims the prosecutor's reason was not genuine, and points out that a Caucasian panelist, Mr. Steppe, expressed similar reservations about the death penalty but was not excused. The record suggests otherwise. On several occasions Mr. Steppe maintained that despite his involvement with Amnesty International as a college student, he could give equal consideration to all three punishments. Mr. Crittenden, on the other hand, repeatedly expressed reservations about his ability to impose the death penalty. We find no discriminatory intent inherent in the prosecutor's explanation.

■ ¶ 21 The prosecutor's removal of Ms. King was also supported by the record. During jury selection, Ms. King stated that she had previously testified for a defendant in an Oklahoma County criminal case. However, she did not disclose that the defendant

was her husband, that she was still married to him, and that one of the prosecutors in this case had prosecuted her husband in the previous case. The prosecutor struck Ms. King after confirming her participation in the case against Ms. King's husband. The prosecutor stated that she believed Ms. King was not being entirely truthful about her prior experience and her failure to recall who the prosecutor was. Whether Ms. King in fact recognized the prosecutor is not the issue. The prosecutor articulated a reason for the challenge which was not only race-neutral, but plausible.

■ ¶ 22 Prospective Juror Cobb had been prosecuted for Driving Under the Influence and other minor offenses. He initially failed to disclose this record, and when confronted about it, stated he had been confused about what kind of criminal record the attorneys were asking about. Appellant points out that there is no evidence Mr. Cobb deliberately misled counsel. This may be true, but the prosecutor also claimed that Mr. Cobb might be overly sympathetic to the defendant in a case such as this where evidence of alcohol abuse would be introduced. Again, the prosecutor articulated a facially plausible race-neutral reason.

■ ¶ 23 The prosecutor moved to strike Ms. Gray because her answers to questions were unclear, and because she made several comments suggesting she would be sympathetic to Appellant's defense. Appellant's claim that the prosecutor deliberately asked Ms. Gray confusing questions is not supported by the record. Ms. Gray stated that in her opinion, people who acted under the influence of alcohol were less responsible for their actions. The prosecutor's concern about Ms. Gray's ability to assimilate the facts and follow the law was a plausible, race-neutral reason for removing her. In conclusion, we find no evidence that the prosecutor's stated reasons for striking these panelists were so fantastic or incredible as to warrant relief. Proposition 8 is denied.

---

8. As an initial matter, we note that Appellant is Caucasian, his victims were Caucasian, and that there were no identifiable race-related issues in the trial itself; that one of the panelists complained of here (Ms. King) was not, according to the trial court, of a minority race; that several members of the final jury panel were of a minority race; and that the prosecutor did not use every peremptory challenge to remove a minority panelist.

¶ 24 In Proposition 9, Appellant contends the trial court erred in excusing two prospective jurors for not being truthful, without first determining whether their "erroneous" responses to questions posed by the court were merely inadvertent. Specifically, upon being questioned about past or present criminal charges, one panelist did not disclose that she had pending criminal charges for driving under the influence and drug possession, and the second panelist did not disclose that he had pled guilty to drug possession in 1986. The trial court removed the panelists only after each was privately questioned, with counsel for each party present. The first panelist admitted not being truthful about her pending criminal charges. The second panelist continued to give vague, misleading, and inaccurate information about his record, even when the trial court confronted him with specifics about his case known to the court. If the trial court even suspects that any given prospective juror is not qualified to serve, it should excuse that person from the panel. *Boutcher v. State*, 4 Okl.Cr. 576, 111 P. 1006, 1008 (1910). Appellant has failed to show that he was denied a fair trial or an impartial jury by the removal of these prospective jurors. "[A] defendant has no vested right to have a particular juror out of a panel. His right is that of objection rather than that of selection." *Lewis v. State*, 1978 OK CR 123, ¶ 4, 586 P.2d 81, 82. The trial court made an excellent record as to why it found these two panelists unfit to serve. We find no abuse of discretion. *Id.;* 22 O.S.2001, § 659(2). Proposition 9 is denied.

## III. FIRST–STAGE EVIDENTIARY ISSUES

### A. Mental health rebuttal evidence

¶ 25 After Appellant gave notice that he intended to present evidence of mental illness as part of a diminished capacity defense, the State obtained permission for Appellant to be interviewed by Dr. John Call, a psychologist. Dr. Call administered two "psychometric techniques" to attempt to determine whether Appellant was "malingering," *i.e.*, feigning cognitive and memory deficits. He also compiled information to assess Appellant's score on a technique known as the Hare Psychopathy Checklist.

¶ 26 The State presented Dr. Call as a rebuttal witness in the guilt phase of trial, after Appellant himself had testified, and after the defense had presented expert psychological and psychiatric testimony regarding Appellant's intelligence and state of mind. Besides concluding that Appellant appeared to be feigning or exaggerating cognitive, memory, and emotional disorders,[9] Dr. Call testified that Appellant exhibited many traits of a psychopath. Dr. Call defined a "psychopath" as a "maladaptive personality disorder or style, a way of behaving and seeing the world that is destructive to the individual and society." He testified that psychopathy was not generally recognized as a "mental disorder" on its own. According to Dr. Call, Appellant's testimony blaming the shootings on his wife's refusal to return his property was consistent with a psychopathic tendency to shirk responsibility for one's own actions. Dr. Call also testified that those with a psychopathic disorder tend to be more violent than others.

¶ 27 In Proposition 2, Appellant challenges Dr. Call's testimony about psychopathy on several grounds. He claims that the testimony was presented without sufficient notice, that Dr. Call's analysis was not shown to be scientifically reliable, and that Call's conclusions were irrelevant to the issues in the guilt phase of the trial. Appellant's objections on the grounds of notice and relevancy were preserved by a timely objection before Dr. Call testified. His objection to the reliability of Dr. Call's methods was not made until after Dr. Call had testified on direct examination, and will therefore be reviewed only for plain error. *Short v. State*, 1999 OK CR 15, ¶ 68, 980 P.2d 1081, 1103.

¶ 28 First, we reject Appellant's contention that Dr. Call's testimony should have been excluded as a discovery sanction.

---

9. The two tests Dr. Call administered himself were the Validity Indicator Profile and the Test of Neuropsychological Malingering. Dr. Call testified that a prior test for malingering of emotional problems administered by another expert (SIRS) had been improperly scored, and that the results of that test did, in fact, suggest Appellant may be malingering.

Generally, the State need not give advance notice of rebuttal evidence, because it cannot know before trial what evidence will be relevant in rebuttal. *Goforth v. State,* 1996 OK CR 30, ¶ 3, 921 P.2d 1291, 1292. Dr. Call only interviewed Appellant after the defense gave notice that it intended to present a defense based on Appellant's mental health. Defense counsel was present when Dr. Call interviewed Appellant. Appellant had access to his own mental-health experts to review Dr. Call's notes and testimony. After Dr. Call testified on direct examination, the trial court granted Appellant's request for additional time to prepare for cross-examination. Appellant was not unfairly surprised by Dr. Call's testimony.

¶ 29 We next consider whether the trial court erred by not holding a hearing on the reliability of Dr. Call's methods consistent with *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert,* the Supreme Court recognized a trial court's important responsibility, as well as its broad discretion, in assessing the admissibility of novel scientific evidence. The Court identified several factors which may aid trial judges in determining whether expert evidence is scientifically valid, and thus reliable enough, to be admissible under the permissive guidelines of the Federal Rules of Evidence. The Court stressed that its list of relevant factors was not exhaustive, and that whether any of the factors mentioned were applicable could only be determined on a case-by-case basis. In essence, the Court held that while not all evidence deemed "scientific" had to earn general acceptance in the scientific community before being admissible, all such evidence should bear some indicia of traditional scientific method. The focus should be "solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2797. The Court subsequently extended *Daubert's* principles to non-scientific but otherwise technical and specialized expert testimony in *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150–51, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999). We adopted the *Daubert* analysis in *Taylor v. State,* 1995 OK CR 10, ¶ 15, 889 P.2d 319, 328–29, and have likewise extended it (per

*Kumho*) to other types of expert testimony. *Harris v. State,* 2000 OK CR 20, ¶ 9, 13 P.3d 489, 493.

¶ 30 Before Dr. Call testified, the trial court held an *in camera* hearing on the techniques he used and the reasonableness of his reliance on certain information to reach his conclusions. The hearing was consistent with our holding in *Lewis v. State,* 1998 OK CR 24, ¶ 21, 970 P.2d 1158, 1167, that the trial court should determine the admissibility of expert testimony before it is presented to the jury. At that hearing, Dr. Call stated that the Hare Psychopathy Checklist was "the most widely respected technique to assess psychopathy." He testified as to his experience in administering the technique, and explained that the Checklist necessarily required him to obtain information from immediate family which, in this case, included the surviving victim, Mrs. Harris. Dr. Call testified that he did not tell Mrs. Harris the purpose of his inquiry, and that he took her potential for bias into account. He also stated that not all of Mrs. Harris's observations about Appellant were negative, and that many of her observations were corroborated by others, including Appellant himself. The defense cross-examined Dr. Call about his methods, but did not present any evidence of its own. The trial court found Dr. Call's methods reliable and his testimony admissible. Defense counsel did not claim this hearing was insufficient under *Daubert* until after Dr. Call had testified on direct examination. Based on the information developed at the original *"Lewis"* hearing, the trial court concluded that no further *Daubert* inquiry was necessary.

¶ 31 Appellant complains that the *Lewis* hearing was not tantamount to a *Daubert* hearing, because it did not address either "relevancy or reliability of psychopathy opinion testimony *in the guilt/innocence phase of a criminal trial,*" and claims that the Hare technique is "clearly irrelevant and unreliable *in this context*" (emphasis added). We view these concerns as a matter of general relevance, not affecting the soundness of Dr. Call's methods themselves. There was no evidence that Dr. Call modified the Hare

technique in any way, or that he used it to assess anything but Appellant's psychopathic tendencies. Appellant's complaint is not that the Hare Psychopathy Checklist is unreliable *per se*, but that the Checklist did not assist the trier of fact, *see* 12 O.S.2001, § 2702, because it was not a reliable indicator of anything relevant to Appellant's guilt.[10] We conclude that it was.

¶ 32 Appellant correctly notes that the Hare Psychopathy Checklist is routinely used to determine whether a person poses a threat to others generally; thus, the Checklist is often employed in capital-sentencing proceedings (*e.g.* to show the defendant is a continuing threat to society) and civil commitment proceedings (*e.g.* to justify involuntarily commitment of a sexual predator).[11] However, merely because psychopathy evidence is relevant for these purposes does not render it irrelevant for any other purpose. Any ability of the Checklist to predict future behavior must necessarily be based on its ability to indicate tendencies presently existing in the subject's personality—which in turn is based, in part, on an examination of the subject's past behavior.

¶ 33 Appellant's own experts— also relying in part on Appellant's past behavior—testified to support the defense theory that Appellant's mental functioning was impaired, and ultimately, that Appellant was (at least at the time of the crime) unable to form a specific intent to kill. In turn, the State was entitled to offer alternative explanations of Appellant's behavior. Appellant points out that psychopathy is not a recognized mental disorder. This, of course, is exactly why the State introduced the evidence in question: to show that Appellant's behavior was not the result of a diminished mental capacity, but rather the product of a generally violent personality for which he should be held accountable.[12] We have repeatedly held that the State may present rebuttal evidence on mental-health issues raised by the defense. *See Lockett v. State,* 2002 OK CR 30, ¶¶ 22–25, 53 P.3d 418, 425; *Van White v. State,* 1999 OK CR 10, ¶ 52, 990 P.2d 253, 268–69; *Maghe v. State,* 1980 OK CR 100, ¶ 7, 620 P.2d 433, 435; *see also* 12 O.S.2001, § 2404(A)(1) (where accused presents evidence of a pertinent character trait, the prosecution may present evidence to rebut the same). Dr. Call's opinions, and prosecutor commentary on this evidence as bearing on Appellant's ability to form an intent to kill, were not improper.

¶ 34 Finally, we note that the jury was well aware of the limitations on Dr. Call's testimony. Dr. Call made it clear that while Appellant exhibited many behaviors associated with psychopathy, he also exhibited many behaviors inconsistent with psychopathy. Dr. Call admitted he could not conclusively state that Appellant was a psychopath, and conceded that even a psychopath may suffer from some other recognized mental illness. The trial court's limiting instruction, which Appellant did not object to, was patterned after the one used by the trial court in *Lewis*

---

10. Appellant concedes as much in his reply brief. The authorities cited in his brief in chief show that the Hare Checklist has been used for over twenty years, and during that time has garnered some criticism over its predictive abilities. Because the Checklist is not "novel" scientific evidence, we need not subject it to the *Daubert* analysis. *Harris v. State,* 2000 OK CR 20 at ¶ 9, 13 P.3d at 493. The fact that the Checklist has been the subject of criticism over the years does not, by itself, render it unreliable. *See Taylor,* 1995 OK CR 10 at ¶ 15, 889 P.2d at 328 (*Daubert* test is more "flexible" than its predecessor, which focused exclusively on a method's general acceptance in the relevant scientific community).

11. *See e.g. Lockett v. State,* 2002 OK CR 30, ¶¶ 22–25, 53 P.3d 418, 425 (psychopathy evidence admitted in capital sentencing phase); *In re Commitment of Burgess,* 262 Wis.2d 354, 665 N.W.2d 124, 134–35 (2003) (psychopathy evidence used to support civil commitment of convicted sexual predator).

12. In fact, whether evidence of psychopathic tendencies is helpful or harmful to the accused may largely be a matter of strategy. The fact that a personality trait is not itself tantamount to legal insanity does not prevent the defense from using such evidence to its advantage. *See e.g. Smetana v. State,* 991 S.W.2d 42, 46 (Tex.App.1998) (where defense used psychopathy evidence, derived from the Hare Psychopathy Checklist, as part of an insanity defense). Whether the personality trait is psychopathic tendencies or, as here, chronic alcohol and drug abuse, the defense may present it in combination with other factors in hopes of mitigating the offense.

*v. State,* and we find it appropriate here as well. Proposition 2 is denied.

## B. Domestic violence evidence

▆▆▆▆▆ ¶ 35 In the guilt stage of· trial, the State presented evidence that Appellant had physically and verbally abused his wife for years. In Proposition 4, Appellant claims that this evidence was irrelevant to the issues in the case and should not have been admitted. We disagree. Evidence of other wrongs, crimes, or bad acts committed by the accused may be relevant to such issues as motive and intent. 12 O.S.2001, § 2404; *Burks v. State,* 1979 OK CR 10, ¶ 2, 594 P.2d 771, 772, *modified on other grounds, Jones v. State,* 1989 OK CR 7, ¶ 8, 772 P.2d 922, 925. We have often held that in marital homicide cases, prior acts of abuse committed by the accused against the victim may be relevant to the issue of intent. *See e.g. Smith v. State,* 1996 OK CR 50, ¶ 20, 932 P.2d 521, 530, *cert. denied,* 521 U.S. 1124, 117 S.Ct. 2522, 138 L.Ed.2d 1023 (1997); *Cheney v. State,* 1995 OK CR 72, ¶ 49 & n. 54, 909 P.2d 74, 87 & n. 54; *Hooker v. State,* 1994 OK CR 75, ¶ 25, 887 P.2d 1351, 1359, *cert. denied,* 516 U.S. 858, 116 S.Ct. 164, 133 L.Ed.2d 106 (1995). The fact that the last injuries Appellant inflicted upon his wife were not fatal does not render evidence of his prior abusive conduct any less relevant to his intentions. The only dispute in the guilt phase of trial was Appellant's intent. Evidence of Appellant's prior threats and physical abuse toward his wife was relevant to show that his threats to kill Mrs. Harris, her family, and Merle Taylor, made shortly before the shootings, were not idle ones. The trial court instructed the jury to consider the prior acts of abuse only for such limited purposes. Proposition 4 is denied.

¶ 36 The State also presented the expert testimony of Deb Stanaland, who had years of experience interviewing and counseling victims of domestic abuse. Stanaland did not interview Mrs. Harris personally, but was called to describe common patterns in abusive relationships. Appellant attacks this evidence on several grounds. In Proposition 3,

he claims that Stanaland was unqualified to testify about domestic abuse, that her methods had not been established as reliable, and that her testimony was irrelevant in any event. The State gave pretrial notice of its intent to present this evidence, and Appellant preserved his challenges on ·appeal by filing pretrial objections and renewing those objections during trial.

▆▆▆▆▆ ¶ 37 We reject Appellant's claim that Stanaland was not qualified to testify on the subject of domestic violence. Appellant points out that Stanaland holds no professional degree specifically relating to her field of expertise. An "expert" need not hold a professional degree. *Salazar,* 1996 OK CR 25 at ¶ 32, 919 P.2d at 1129. Any combination of education, training, and experience may qualify a person as an "expert" on a particular subject. *See id.;* 12 O.S.2001, § 2702. Stanaland's qualifications are established in the record before us.

▆▆▆▆ ¶ 38 To illustrate common behavioral patterns observed in abusive relationships, Stanaland used two diagrams, the "Power/Control Wheel" and the "Cycle of Violence." Appellant contends that these analytical models were not shown to be reliable, citing *Daubert* and *Kumho* (discussed above in Proposition 2). Appellant's complaint about the reliability of these diagrams is made for the first time on appeal, so we review only for plain error. *Romano v. State,* 1995 OK CR 74, ¶ 20, 909 P.2d 92, 109. We do not agree that these models had to be subjected to a *Daubert/Kumho* inquiry, for two reasons. First, as Appellant concedes, they are not novel. They were developed decades ago to illustrate cycles of behavior commonly seen in cases of domestic abuse.[13] *Harris,* 2000 OK CR 20 at ¶ 9, 13 P.3d at 493 (*Daubert/ Kumho* inquiry applies only to "novel" scientific and technical methods). More fundamentally, however, these diagrams are not, in our view, the kind of evidence susceptible to a *Daubert/Kumho* inquiry, at least as they were employed in this case. The "Power/Control Wheel" and the "Cycle of Violence" diagrams were used only

13. *Accord State v. Weaver,* 2002 S.D. 76 at ¶ 27, 648 N.W.2d 355 ("battered woman's syndrome" and "cycle of violence" are established concepts which have been subjected to peer review).

to help the jury visualize the substance of Stanaland's testimony. "Experts regularly rely on illustrative aids so that the jury may better understand their testimony." *Harris,* 2000 OK CR 20 at ¶ 10, 13 P.3d at 493. Any concerns about the reliability of Stanaland's illustrative diagrams should instead be directed at the field of study which produced them.

¶ 39 Appellant contends, as he did at trial, that because Mrs. Harris was a victim in this case and not a perpetrator, her beliefs, behavior, and perceptions about her relationship with Appellant were not at issue, and therefore, Stanaland's testimony was not relevant to any material issue in the case. We disagree. As noted in our discussion of Proposition 4, the Harrises' history of domestic strife was relevant to Appellant's intent when he shot at his wife and Merle Taylor. In cross-examining Mrs. Harris, the defense pointed out that despite claiming to have endured some twenty years' worth of abuse, she never filed for divorce or sought a protective order until a few weeks prior to the shootings in this case. The State was therefore entitled to present Stanaland's expert testimony to help the jury understand possible causes for such unreasonable behavior. *Cf. Davenport v. State,* 1991 OK CR 14, ¶¶ 15–17, 806 P.2d 655, 659–660 (expert testimony regarding Child Abuse Accommodation Syndrome was proper to explain why some child victims delay reporting and/or recant allegations of sexual abuse). We do not agree with Appellant's claim that Stanaland improperly bolstered Mrs. Harris's credibility. Stanaland made clear to the jury that she had not interviewed either of the Harrises, so her testimony was based on generalities. Stanaland's observations were aimed at explaining why some abused spouses do not end their abusive relationships, and she did not specifically comment on the believability of Mrs. Harris's claims. *See Davenport, id.* at ¶ 9 (expert's observations regarding Child Abuse Accommodation Syndrome were prop-

er, where expert testified in generalities and did not tell the jury who to believe). Moreover, at defense counsel's request, the trial court gave the jury a contemporaneous limiting instruction on how to apply Stanaland's testimony, stressing that it was not offered to prove that Mrs. Harris was, in fact, abused.[14] Appellant has failed to meet his burden of demonstrating that Stanaland's testimony violated his substantial rights. *Sanders v. State,* 2002 OK CR 42, ¶ 14, 60 P.3d 1048, 1050. Proposition 3 is denied.

**C. Photographs of the homicide victim**

¶ 40 During the guilt phase, the State introduced a number of color photographs of the shooting scene. A few of these photographs showed the body of Merle Taylor from various angles and distances. Appellant objected to some of these photographs at trial, claiming they were unduly prejudicial and/or cumulative. In Proposition 12, Appellant argues that some or all of the photographs of Taylor's body should have been excluded because there was no dispute as to the cause of his death or the location of his wounds. We find nothing objectionable about these photographs. They were few in number, were not particularly gruesome, and did not mislead the jury as to the consequences of Appellant's actions; they accurately showed the injuries inflicted by Appellant. *Welch v. State,* 2000 OK CR 8, ¶ 31, 2 P.3d 356, 371, *cert. denied,* 531 U.S. 1056, 121 S.Ct. 665, 148 L.Ed.2d 567 (2000). The State was entitled to present the complete picture of the homicide, and was not required to sanitize the evidence simply because Appellant did not contest the fact of the shooting itself. Proposition 12 is denied.

**D. Sufficiency of the evidence**

¶ 41 In Proposition 6, Appellant claims the evidence was insufficient to convict him of two of the charges, First Degree Murder (Count 1) and Shooting with Intent to Kill (Count 2), in that the State failed to prove

---

14. The instruction read: "Ladies and gentlemen of the jury, you will hear at this time the testimony of Deb Stanaland as to general characteristics of domestic abuse and its effect. You are to consider this testimony solely on the issue of behaviors, beliefs, and perceptions of victims of domestic abuse, and for this limited purpose alone. You may not consider this evidence as proof of guilt or innocence of the defendant of a specific offense charged in the Information." (Tr. 8, 26–27)

beyond a reasonable doubt that he harbored a specific intent to kill either Mr. Taylor or Mrs. Harris. Appellant contends that the evidence of his "drug and alcohol intoxication, mental illness, and/or intellectual deficiency" was sufficient to raise a reasonable doubt as to his ability to form such an intent. We disagree.

¶ 42 Appellant's evidence was not always consistent with his theory of defense. While contending he was unable to form a specific intent *to kill,* Appellant testified that he was extremely mad on the morning of the shootings, and that while he did not intend to kill his wife, he did specifically intend *to injure* her when he shot her and pistol-whipped her. As for the death of Merle Taylor, Appellant at one point characterized it as an "accident." Appellant did not claim that he fired at Taylor without an intent to kill him; rather, he claimed that the gun apparently had a "hair trigger," and that he did not mean to fire at Taylor at all, even the second time he shot him.

¶ 43 Appellant testified that he drank several beers and took several Valium tablets in the hours preceding the shootings. However, two years after the fact, Appellant was able to recall his version of the sequence of events in great detail. He recalled for the jury, step-by-step, what he did that morning and why he had done it. He admitted he was extremely mad at Mrs. Harris, and claimed it was her fault that Taylor was shot. He testified that he fled the scene because he knew he had shot someone, and "just wanted out of there" so he could "try to figure [his] way out of this mess." One of the few facts Appellant could not recall on the witness stand was that after he was apprehended, he told a police detective that he had shot Taylor in self-defense.

¶ 44 The State's evidence showed that Appellant made numerous threats, about killing Mrs. Harris, Merle Taylor, and others, in the days leading up to the shootings; that immediately before the shootings, Appellant called Mrs. Harris at the transmission shop and warned that "Everybody is going to be sorry"; that Appellant voluntarily went to the transmission shop, carrying a firearm that he knew to be loaded as well as extra ammuni-

tion, brandished the firearm when Taylor asked him to leave, pushed Taylor down and shot him twice, fired at Mrs. Harris several times, and chased her down and beat her with the gun when it would fire no more. Live rounds and shell casings found at the scene suggested that Appellant had manually emptied the revolver of its spent casings, and was trying to reload, before he ran away. Witnesses described Appellant as looking angry but focused. Appellant drove away from the scene and hid in a friend's garage.

¶ 45 The deliberate nature of Appellant's actions before, during, and after the shootings, his ability at trial to recall the events in great detail, and his admission that he specifically intended to harm Mrs. Harris, convince us that the jury's rejection of his diminished-capacity/intoxication defense was reasonable. Considering all of the evidence in a light most favorable to the State, a rational trier of fact could have found that Appellant harbored the requisite specific intent to kill both Taylor and Mrs. Harris. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Myers v. State,* 2000 OK CR 25, ¶ 39, 17 P.3d 1021, 1032; *Cheney v. State,* 1995 OK CR '72, ¶¶ 33–44, 909 P.2d 74, 84–86. Proposition 6 is denied.

## IV. FIRST STAGE JURY INSTRUCTION ISSUES

¶ 46 In Proposition 5, Appellant contends that the trial court's instructions to the jury relating to his defense were confusing, improper, and denied him a fair trial. Appellant offered evidence that "low intelligence, mental illness, and drug and alcohol induced intoxication" combined to give him "limited control" over his actions at the time of the crimes. The goal of Appellant's defense was to show that at the time of the shootings, he could not have formed a specific intent to kill. He requested and received a jury instruction on a lesser form of homicide, First–Degree Manslaughter, arguably compatible with his defense. However, because Appellant had attempted to show that he was at least "borderline" mentally retarded, the trial court also instructed the jury, over defense objection but consistent with Oklahoma law, that

mental retardation was a complete defense to culpability if it rendered the accused incapable of knowing the wrongfulness of his acts. *See* 21 O.S.2001, § 152(3).

¶ 47 Appellant claims the trial court's instruction on mental retardation as a complete exculpatory defense was not supported by the evidence. We agree. The accused is entitled to instructions on any defense theory, whether it be mitigating or exculpatory, if the law and evidence reasonably support that theory. *Cipriano v. State,* 2001 OK CR 25, ¶ 30, 32 P.3d 869, 876. Because, as Appellant concedes, the evidence failed to suggest he was mentally retarded to the extent he could not appreciate the wrongfulness of his actions, the trial court's instruction on mental retardation as an exculpatory defense was unwarranted.

¶ 48 We fail to see how this instruction prejudiced Appellant. The instruction actually saddled the State with the additional preliminary burden of proving that Appellant was *not* mentally retarded before he could be convicted of any crime. Even though the outcome might have been unlikely, the instruction gave the jurors the option of finding Appellant not guilty of any crime, if they believed his intellectual capacity was so diminished that he could not distinguish right from wrong. Finally, the instruction in no way discouraged the jury from fully considering Appellant's intellectual abilities, along with his alleged mental illness and substance abuse, on the issue of whether he lacked the ability to form a specific intent to kill. Because the instruction could only have worked to Appellant's benefit, we find no violation of his substantial rights. *McGregor v. State,* 1994 OK CR 71, ¶ 23, 885 P.2d 1366, 1380; *Allen v. State,* 1994 OK CR 13, ¶ 33, 871 P.2d 79, 93. Proposition 5 is denied.

¶ 49 In Proposition 10, Appellant claims error in the trial court's rejection of his proposed instructions on the lesser offense of Second Degree (Depraved Mind) Murder, as well as his proposed instruction attempting to define "reasonable doubt." As to the first claim, the trial court was required to instruct on every degree of homicide reasonably supported by the evidence. *Shrum*

*v. State,* 1999 OK CR 41, ¶ 10, 991 P.2d 1032, 1036. To warrant an instruction on Second Degree (Depraved Mind) Murder, the evidence must reasonably support the conclusion that the defendant committed an act so imminently dangerous to another person as to evince a depraved mind in disregard for human life. *Williams v. State,* 2001 OK CR 9, ¶ 23, 22 P.3d 702, 712.

¶ 50 Appellant shot Taylor twice at close range, immediately after pushing him down to the ground. Appellant testified that he shot Taylor "accidentally," "without thinking or knowing" what he was doing. Instructions on depraved-mind murder are unwarranted when the defense claims the fatal gunshots were fired accidentally. *Crumley v. State,* 1991 OK CR 72, ¶ 13, 815 P.2d 676, 678–79. Furthermore, in determining the sufficiency of the evidence to support a lesser offense, we look to whether the evidence might allow a jury to acquit the defendant of the greater offense and convict him of the lesser. *Cipriano,* 2001 OK CR 25 at ¶ 14, 32 P.3d at 873. Given the substantial evidence that Appellant drove to the transmission shop to do violence (see discussion of Proposition 6), we do not believe any rational trier of fact could have found Appellant evinced a depraved mind but lacked an intent to kill. *Cf. Young v. State,* 2000 OK CR 17, ¶¶ 61–62, 12 P.3d 20, 39–40 (instructions on depraved-mind murder correctly refused where defendant entered restaurant with intent to rob its occupants with firearm, stood directly in front of victim, raised gun, demanded money, and fatally shot victim in the back of the chest when victim tried to defend himself), *cert. denied,* 532 U.S. 1055, 121 S.Ct. 2200, 149 L.Ed.2d 1030 (2001); *Boyd v. State,* 1992 OK CR 40, ¶ 11, 839 P.2d 1363, 1367–68, *cert. denied,* 509 U.S. 908, 113 S.Ct. 3005, 125 L.Ed.2d 697 (1993) (instructions on depraved-mind murder correctly refused where defendant shot victim a second time in the chest at close range).

¶ 51 As for Appellant's requested instruction attempting to define "reasonable doubt," the trial court was correct in refusing it. Appellant concedes that we have long disapproved of attempts by the trial court to define reasonable doubt for the jury. *See*

*Romano v. State,* 1995 OK CR 74, ¶ 101, 909 P.2d 92, 125; *Mayfield v. State,* 17 Okl.Cr. 503, 509, 190 P. 276, 278 (1920). Because Appellant presents no persuasive reason why any definition of 'beyond a reasonable doubt' would assist jurors or eliminate confusion, *see Romano, id.,* we decline to revisit our position. Proposition 10 is denied.

## V. ISSUES RELATING TO PUNISHMENT

### A. Cumulative error regarding defense procedural motions

¶ 52 In Proposition 11, Appellant complains that the denial of several defense motions, individually and collectively, denied him due process of law and a reliable sentencing proceeding. The issues were raised in Appellant's compendium of pretrial motions; the few motions Appellant specifically refers to on appeal focus on capital sentencing issues. As Appellant concedes, we have previously rejected each contention. *See Douglas v. State,* 1997 OK CR 79, ¶¶ 13–16, 951 P.2d 651, 661 (trial court's refusal to permit jury questionnaires or individual *voir dire,* absent compelling circumstances, is not an abuse of discretion); *Williams v. State,* 2001 OK CR 24, ¶ 6, 31 P.3d 1046, 1049 (instruction defining life without parole in a capital case unwarranted); *Hawkins v. State,* 2002 OK CR 12, ¶ 43 & n. 12, 46 P.3d 139, 148 & n. 12 (trial court's refusal to speculate on number of years to be served under a life sentence is proper); *Frederick v. State,* 2001 OK CR 34, ¶¶ 173–74 & n. 13, 37 P.3d 908, 950–51 & n. 13 (Oklahoma's capital sentencing scheme is constitutional; no error to excuse prospective jurors who could not impose death penalty under any circumstances; argument regarding cost-effectiveness of the death penalty is improper; instructions directing jury to presume that any sentence imposed would be carried out are unwarranted; capital defendant has neither right to allocution before jury nor right to argue last; defendant has no right to separate jury for capital sentencing). Appellant has not demonstrated any reason for us to reconsider our position on any of these issues. Proposition 11 is denied.

### B. Sufficiency of evidence to support the "great risk of death" aggravating circumstance

¶ 53 In Proposition 13, Appellant claims the evidence was insufficient to support the single aggravating circumstance found by the jury, *i.e.* that Appellant "knowingly created a great risk of death to more than one person." 21 O.S.2001, § 701.12(2). When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, this Court reviews the evidence in the light most favorable to the State to determine if any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt. *Washington v. State,* 1999 OK CR 22, ¶ 44, 989 P.2d 960, 974. This aggravating circumstance is established by acts which create a great risk of death to another person in close proximity to the homicidal act in terms of time, location, and intent. *Thornburg v. State,* 1999 OK CR 32, ¶ 42, 985 P.2d 1234, 1248, *cert. denied,* 529 U.S. 1113, 120 S.Ct. 1970, 146 L.Ed.2d 800 (2000). Evidence that the perpetrator murdered one person, and threatened to kill others with the apparent ability to do so, is sufficient to support this aggravating circumstance. *Lockett,* 2002 OK CR 30 at ¶ 39, 53 P.3d at 430.

¶ 54 Here, Appellant shot Merle Taylor twice at close range inside the transmission shop, while Mrs. Harris and Jessica Taylor stood a short distance away. Appellant continued shooting, chased Mrs. Harris, shot her several times, and beat her with his gun when all its rounds had been fired. The evidence was more than sufficient to support the claim that Appellant knowingly created a great risk of death to Merle Taylor, Jessica Taylor and Mrs. Harris. *Young,* 2000 OK CR 17 at ¶ 73, 12 P.3d at 42 (great risk of death to another established where defendant fired gun inside restaurant in which at least nine people were present, killing one person and injuring another); *Snow v. State,* 1994 OK CR 39, ¶ 25, 876 P.2d 291, 297–98 (great risk of death to another established where defendant killed victim in private cubicle, but attacked and stabbed a second person moments later), *cert. denied,* 513 U.S. 1179, 115 S.Ct. 1165, 130 L.Ed.2d 1120

(1995); *Stouffer v. State*, 1987 OK CR 92, ¶ 72, 738 P.2d 1349, 1361 (great risk of death to another established where defendant shot two people, one fatally, in different parts of the same house), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988).

¶ 55 Appellant points out that a number of other people were at the transmission shop when the shooting took place, but that these people were not placed at "great risk of death" because they ran away or hid. Appellant suggests that the jury's finding on this aggravating circumstance might have erroneously been based on the testimony of these bystanders. We disagree. Before trial, the State amended its Bill of Particulars to allege that several others besides Jessica Taylor and Mrs. Harris were present and could have been injured when the shootings took place. Appellant filed at least two written objections on the same grounds asserted here. At trial, the State never contended that Appellant created a great risk of death to anyone else but Merle Taylor, Jessica Taylor and Pamela Harris. In fact, during guilt-phase examination of other bystanders who witnessed the shooting, the prosecutor focused on whether they could see how close Mrs. Harris and Jessica Taylor were to the event. The mere fact that other bystanders presented otherwise relevant testimony, during the guilt phase of trial, about what they saw and did when Appellant began his assault, does not convince us that the jury, in the punishment phase, mistakenly based its "great risk of death" finding on that testimony. Proposition 13 is denied.

## C. Victim-impact testimony

¶ 56 In Proposition 14, Appellant challenges the admissibility of the victim-impact evidence introduced in the punishment phase of trial. The State presented testimony from Merle Taylor's wife and son. Each had prepared a brief written statement, and read them from the witness stand. Each also asked the jury to sentence Appellant to death. Appellant objected to these statements before and at trial on several grounds, including those presented here, thus preserving his complaints for full appellate review.

¶ 57 First, Appellant contends the victim-impact statements were improper in that they permitted the victims to express a preference for the death penalty. Such testimony is authorized by statute. 22 O.S.2001, § 984(1). We have held that a brief opinion on the appropriate punishment by a member of the victim's immediate family is permissible. *Murphy v. State*, 2002 OK CR 24, ¶ 45, 47 P.3d 876, 885; *Young*, 2000 OK CR 17 at ¶ 83, 12 P.3d at 43; *compare Miller v. State*, 2001 OK CR 17, ¶¶ 32–36, 29 P.3d 1077, 1084–85 ("amplified" victim-impact opinions on why death sentence was warranted, given without notice to accused, constituted plain error). The sentence recommendations offered by Merle Taylor's son and widow were concise. We find no error.

¶ 58 Next, Appellant complains that the victim-impact evidence in this case over-emphasized the emotional impact of Taylor's death on his loved ones. Appellant compares victim-impact evidence to photographs of homicide victims before their deaths, arguing that any evidence intended to appeal to juror sympathy or emotion is improper. We disagree. The two brief statements made in this case touched upon the ways in which Taylor's death affected his immediate family. 22 O.S.2001, § 984(1). We find no error here. Finally, Appellant argues that victim-impact evidence is *per se* unconstitutional because it functions as a "super-aggravator" outside the statutory process of weighing aggravating and mitigating circumstances. We have rejected this argument before and do so again. *See Murphy*, 2002 OK CR 24 at ¶ 47, 47 P.3d at 886; *Lockett*, 2002 OK CR 30 at ¶ 31, 53 P.3d at 428. Proposition 14 is denied.

## D. Second-stage prosecutorial misconduct

¶ 59 In Proposition 16, Appellant contends that certain comments by the prosecutor in second-stage closing argument violated his right to a fair and reliable sentencing proceeding. First, Appellant complains that the prosecutor mischaracterized his mitigating evidence by rhetorically asking the jury whether it rendered Appellant "less responsible" for his crimes. Appellant

claims that because the purpose of mitigating evidence is to reduce moral culpability at sentencing, not legal responsibility for the offense, *see* OUJI–CR 2nd No. 4–78, these comments effectively told the jury to disregard mitigating evidence entirely. Appellant's argument is based on a selective reading of the prosecutor's argument. The prosecutor clearly mentioned the issue of Appellant's "moral culpability," and the second-stage instructions referred to it as well. Considered in its entirety, the prosecutor's closing argument took issue with each piece of mitigating evidence, but did not tell the jury to ignore it. We find no error here.

██ ¶ 60 The prosecutor also commented that Appellant lacked remorse for his deeds. Appellant's remorse, or lack thereof, was relevant to whether he posed a continuing threat to society—an aggravating circumstance alleged by the State, though ultimately rejected by the jury. *Fowler v. State,* 1989 OK CR 52, ¶ 52, 779 P.2d 580, 589. Appellant claims these comments were improper given that he did express remorse for Taylor's death in his first-stage testimony. There is no error here. The prosecutor's comments were fair inferences based on her assessment of the accused's testimony and his demeanor as a witness. *Mitchell v. State,* 1994 OK CR 70, ¶ 46, 884 P.2d 1186, 1203, *cert. denied,* 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995); *Smith v. State,* 1986 OK CR 158, ¶ 33, 727 P.2d 1366, 1373–74, *cert. denied,* 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987). Appellant testified he was sorry for what had happened, but he also blamed the entire episode on Mrs. Harris, and told the prosecutor she should be ashamed for sponsoring Mrs. Harris's testimony. The prosecutor was free to argue that Appellant's purported expressions of remorse were incomplete or contrived. *Young,* 2000 OK CR 17 at ¶ 95, 12 P.3d at 45; *Sutton v. State,* 1988 OK CR 158, ¶ 11, 759 P.2d 235, 237.

¶ 61 Finally, we find no impropriety where the prosecutor commented that a death sentence would constitute "justice" in this case. Again, Appellant's reading of the prosecutor's argument is selective. Several times during her closing argument, the prosecutor reminded the jurors that it was up to them to determine what punishment was just. *Lockett,* 2002 OK CR 30, ¶ 21, 53 P.3d at 425. Again, we find no error.[15] Proposition 16 is denied.

### E. Mitigating evidence v. aggravating evidence

¶ 62 In Proposition 18, Appellant claims the jury's punishment recommendation is not supported by the evidence because the evidence in aggravation did not outweigh the evidence in mitigation. To explain the jury's finding to the contrary, Appellant proposes that the jury may have been confused by two statements, one by the trial court during jury selection, and one by the prosecutor during second-stage closing argument. Appellant asks this Court to reweigh the evidence and conclude that a death sentence is unwarranted.

██ ¶ 63 The first statement Appellant complains of was the trial court's comment, during jury selection, on the meaning of "mitigating evidence." The trial court stated: "There are things called mitigating circumstances, which is evidence to show that the crime is not as bad, for whatever reason, okay." Appellant claims this comment was legally erroneous because mitigating circumstances do not mitigate the defendant's legal responsibility for the offense itself, but only the defendant's "moral culpability or blame," *i.e.* the appropriate punishment for the offense. *See* OUJI–CR (2nd) No. 4–78. Appellant made no objection to the comment at the time it was made. We fail to see how this isolated comment, on the first day of the trial proceedings, unfairly prejudiced Appellant. The jurors were properly instructed on

---

15. Because Appellant never objected to any of these comments, we review only for plain error. *Freeman v. State,* 1994 OK CR 37, ¶ 15, 876 P.2d 283, 287–88, *cert. denied,* 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). Having found no error at all in the prosecutor's comments, we likewise reject Appellant's claim of cumulative error, and his claim that trial counsel was ineffective for failing to lodge timely objections to them. *Clayton v. State,* 1995 OK CR 3, ¶ 27, 892 P.2d 646, 657, *cert. denied,* 516 U.S. 846, 116 S.Ct. 137, 133 L.Ed.2d 84 (1995); *Myers v. State,* 2000 OK CR 25, ¶ 86, 17 P.3d 1021, 1038–39.

the definition of mitigating evidence when it was time for them to actually consider the issue, at the close of the punishment phase several weeks later. *Mooney v. State*, 1999 OK CR 34, ¶ 37, 990 P.2d 875, 887.

¶ 64 The second comment Appellant complains of was the prosecutor's statement, during closing argument in the punishment phase, comparing Appellant's mitigating evidence of diminished capacity with his murdering Merle Taylor, shooting Pam Harris, and trying to shoot Jessica Taylor: "Gosh, which one of those outweighs the other? Low I.Q., shoots at three people." Appellant characterizes this comment as (1) improperly asking the jury to weigh each mitigating factor separately against the aggravating factors, and (2) improperly suggesting that non-capital offenses were part of the capital weighing process. We disagree on both points. Again, Appellant did not object to this comment at the time it was made, waiving all but plain error. The prosecutor had a right to take up each alleged mitigating factor separately for argument. In her very next sentence, the prosecutor reminded the jury to consider whether the mitigating evidence, taken "altogether," outweighed the evidence in aggravation. Reviewed in its entirety, the prosecutor's argument did not attempt to override the jury's instructions on how to weigh aggravating and mitigating evidence. *Salazar v. State*, 1998 OK CR 70, ¶ 31, 973 P.2d 315, 326.

¶ 65 Appellant's suggestion that the jury could not consider the assault on Mrs. Harris as part of the capital sentencing process is meritless. The State was seeking to establish that Appellant knowingly created a great risk of death to others during the shooting incident. Besides Mr. Taylor, who was in fact killed, those allegedly placed at a great risk of death were Mrs. Harris and Jessica Taylor. The fact that Appellant had been convicted, in the guilt phase, of shooting Mrs. Harris with the intent to kill her, did not preclude the State from using the same evidence to support an aggravating circumstance in the capital punishment phase of the trial. The possibility that evidence supporting the "great risk of death" aggravating circumstance can constitute an independent non-capital offense is obvious.[16] In conclusion, we do not find that the jury was misinformed on these issues as Appellant claims. *Fisher v. State*, 1987 OK CR 85, ¶ 25, 736 P.2d 1003, 1011. Proposition 18 is denied.

## F. Instructions on weighing aggravating and mitigating circumstances

¶ 66 In Proposition 19, Appellant alleges constitutional error in the fact that the second-stage jury instructions (OUJI–CR 2nd Nos. 4–76 and 4–80) required the jurors, before imposing the death sentence, to find the existence of any aggravating circumstance beyond a reasonable doubt, and to find that any existing aggravating circumstances outweighed existing mitigating circumstances, but did not necessarily require them to find that the aggravating circumstances outweighed mitigating circumstances by proof beyond a reasonable doubt. Appellant relies on *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), where the Supreme Court held that in a capital case, any factual findings which trigger an increase in the available punishment must be made by the finder of fact upon proof beyond a reasonable doubt. We recently addressed the same claim in *Torres v. State*, 2002 OK CR 35, ¶ 7, 58 P.3d 214, 216, and held that the fact which increases the maximum possible punishment for first degree murder to a sentence of death is the finding of at least one aggravating circumstance: "It is that finding, not the weighing of aggravating and mitigating circumstances, that authorizes jurors to consider imposing a sentence of death." *Id.* The requirement set

---

16. *See e.g. Young*, 2000 OK CR 17 at ¶ 73, 12 P.3d at 42 (defendant, convicted of fatally shooting one man and injuring another in the same incident, knowingly created great risk of death to more than one person); *Selsor v. State*, 2000 OK CR 9, ¶ 25, 2 P.3d 344, 352 (where defendant was charged with fatally shooting one store clerk and wounding another, surviving clerk's testimony was also relevant to whether defendant created a great risk of death to more than one person); *Taylor v. State*, 2000 OK CR 6, ¶ 23, 998 P.2d 1225, 1231 (evidence established great risk of death aggravator where defendant fatally shot one person, injured three others, and was convicted of all three crimes in the first stage of trial).

forth in *Ring* is satisfied by Oklahoma law which requires the jury to unanimously find any aggravating circumstance beyond a reasonable doubt. We decline to revisit our holding in *Torres.* Proposition 19 is denied.

### G. Cumulative error in second stage deliberations

¶ 67 In Proposition 15, Appellant alleges error in the trial court's handling of second-stage jury deliberations. He claims that "forcing" the jurors to deliberate after reporting a deadlock, combined with a misleading response to a jury question about Department of Corrections policies, denied him a fair sentencing proceeding.

¶ 68 The jurors deliberated punishment over a three-day period. On the second day, after about eleven hours of deliberations, they sent a note to the trial court, which read:

> If sentenced to life in the State Penitentiary without the possibility of parole is it possible to be put in a correctional facility such as Jess Dunn [17] instead of a penitentiary at some time.

The trial court thoroughly discussed formulating a response with counsel for both parties. A representative of the Department of Corrections was contacted in an attempt to obtain more specific information about the issue. The court then called the jurors back to the courtroom and asked them to clarify the question. The author of the question asked:

> If you're sentenced to life without the possibility of parole in the penitentiary, do you stay in McAlester or Lexington or could you possibly go to a minimum security facility at some point? [18]

The trial court responded orally, giving an instruction that defense counsel had objected to and that the State had approved:

> The wording of the statutes "in the state penitentiary" probably relates back to statehood when there was only one penitentiary. An inmate is processed through the Lexington Assessment and Reception Center and classified based on a number of factors. The Oklahoma Department of Corrections has the sole discretion for placement of inmates based on their criteria. Any inmate may be placed at any of the 25 plus facilities at some time.

¶ 69 The jurors then returned to their deliberations. A short time later that day, defense counsel received a facsimile response from DOC with additional information. The follow-up response clarified that according to current DOC policy, convicts serving any sentence for murder, or any sentence of life without parole, would not be assigned to a facility classified with less than "medium" security.[19] Defense counsel asked the court to advise the jury of this additional information. The trial court declined, stating, "We've told them the truth, so I'm going to leave it alone." Defense counsel then asked the court to take the case from the jury and impose a sentence less than death, pursuant to 21 O.S.2001, § 701.11.[20]

¶ 70 Later on the second day of deliberations, the jurors sent a note indicating that some of them were "locked" in their decision,

**17.** Jess Dunn Correctional Center is a minimum-security facility operated by the Oklahoma Department of Corrections.

**18.** Oklahoma State Penitentiary is located in McAlester, Oklahoma. Lexington, Oklahoma is the home of Lexington Assessment and Reception Center, where all inmates are initially sent before being transferred to an appropriate facility; it is also the home of two medium/minimum-security facilities operated by the Department of Corrections.

**19.** The information from DOC is included in the record as Court's Exhibit 13. The policy states that "Any inmate who has ever been convicted of MURDER I OR MURDER II or has the wording of murder or homicide on the Judgment and Sentence will be placed no lower than medium security.... Any inmate who has a sentence of LIFE WITH0UT PAROLE will be placed no lower than medium security." This language was included in a provision entitled "Mandatory Overrides." The discussions between the court and counsel suggest that according to a DOC representative they spoke with, these classifications can only be countermanded by a departmental head of DOC, and that such an override would amount to a political decision.

**20.** Section 701.11 states in relevant part: "If the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life without parole or imprisonment for life."

and asking for guidance. The trial court called them back into the courtroom, and was informed that the jury was divided either "ten to two or eleven to one." The jurors were instructed to continue their deliberations, which they did until being sequestered for the night. On the third day of deliberations, defense counsel renewed her motion that the court take the case from the jury, or alternatively, that the court instruct the jury that it had that option if they failed to agree on punishment. *See* OUJI–CR (2nd) 4–83. These requests were denied.

¶ 71 Around noon on the third day of deliberations, the court received another note about the jury's progress, claiming "this jury stands at seven to five firm. What can we do, and what options do we have?" Again, the trial court denied defense counsel's request to take the case from the jury or instruct them pursuant to OUJI–CR (2nd) 4–83. Instead, the court summoned the jurors for a lunch break and admonished them to continue deliberating after lunch, saying, "If you can reach a verdict, we need a verdict." At approximately 2:00 p.m., the jurors sent a note asking if Appellant had any other bad conduct that they were not informed of. The trial court instructed them that they had all the law and evidence necessary to reach a verdict. At approximately 3:30 p.m., the trial court once again denied defense counsel's request that it take the case from the jury. At approximately 4:00 p.m., the jury returned with a verdict imposing a sentence of death on Count 1.

¶ 72 The trial court was authorized to take the case from the jury and impose a sentence less than death if the jury was unable to reach a unanimous verdict on punishment "within a reasonable time." 21 O.S. 2001, § 701.11. Indeed, we have held that where a capital jury is deadlocked on the issue of punishment, the trial court should give the deadlock instruction specific to capital sentencing proceedings, OUJI–CR (2nd) 4–83, which is patterned after § 701.11. *Hooks v. State*, 2001 OK CR 1, ¶ 31, 19 P.3d 294, 312, *cert. denied*, 534 U.S. 963, 122 S.Ct. 371, 151 L.Ed.2d 282 (2001). Whether a deadlock truly exists, and what constitutes a "reasonable time" under § 701.11, must be determined on a case-by-case basis, and the trial court's decision on the matter is accorded substantial deference. *Gilbert v. State*, 1997 OK CR 71, ¶ 62, 951 P.2d 98, 115, *cert. denied*, 525 U.S. 890, 119 S.Ct. 207, 142 L.Ed.2d 170 (1998). So long as the jurors appear to be making progress in their deliberations, the actual number of hours they spend is not determinative.

¶ 73 We reject Appellant's claim that by refusing to give additional instructions or take the case from the jury and sentencing Appellant itself, the trial court effectively coerced the jurors into reaching a unanimous verdict. Appellant's first request for such action was made on the second day of punishment deliberations, shortly after the jurors had requested and received additional information, and before they reported any difficulty in arriving at a verdict. There was simply no reason at that time to believe the jurors would not be able to reach a verdict. Appellant's second request to take the case from the jury came after they reported some of their number were "locked"; however, the foreperson stated that the numerical division was "ten to two *or* eleven to one"; inherent in this answer was the possibility that progress was still being made. Appellant's third request to take the case from the jury came the next day, after they reported being stalled at "seven to five firm"; the very fact that their numerical division had changed drastically since the day before supported a conclusion that there was no "deadlock" yet. Appellant's final request came later on the third and final day, shortly after the jury had once again communicated with the court—not to report a deadlock, but to seek additional information about Appellant. It is apparent that the jurors made continuous progress throughout their deliberations, and that they had many changes of mind as to votes. The trial court did not abuse its discretion in refusing to take the case from them, or instructing them that it could do so.

¶ 74 Nor are we persuaded that jury sequestration was violated when, at one point during the deliberations, the foreperson saw the trial judge in the courthouse, gave a "thumbs up" gesture and winked, and on the final day of deliberations, the foreperson

came down from the deliberation room to inform the court that a decision appeared to be forthcoming. Unilateral gestures of this sort are not equivalent to "communications." *See Mollett v. State*, 1997 OK CR 28, ¶ 42, 939 P.2d 1, 11–2, *cert. denied*, 522 U.S. 1079, 118 S.Ct. 859, 139 L.Ed.2d 758 (1998). The trial judge promptly made note of these apparently spontaneous incidents in the record, and there is no evidence that the court responded to them, verbally or otherwise.

 ¶ 75 More troubling, however, is the information the jurors received in response to their question about Department of Corrections policies. Oklahoma has a long history of declining to answer jurors' questions about parole. No Judge knows with certainty how long it will be until a parole is granted by the executive branch. This Court has said, "[w]e refuse to open a floodgate of parole information which would serve only to muddy the waters, and could later be used to drown other defendants downstream." *Mayes v. State*, 1994 OK CR 44, ¶ 136, 887 P.2d 1288, 1318. Likewise, no Judge can predict, over time, where the Department of Corrections will assign a prisoner to serve a sentence. Any instruction attempted by the judicial branch, about future actions of the executive or legislative branch in these areas, is doomed to inaccuracy. There is simply no clear answer to this type of question, and for that reason, none should be attempted. Because we cannot say this error did not contribute to the jury's sentencing decision, Appellant's death sentence on Count 1 is **VACATED**, and the case is **REMANDED FOR RESENTENCING.** Given our resolution of this case, Appellant's remaining propositions of error are moot.[21]

## DECISION

The judgment of the district court as to all counts is **AFFIRMED.** The sentences on Counts 2 and 3 are **AFFIRMED.** The death sentence imposed on Count 1 is **VACATED** and the case is **REMANDED FOR RESENTENCING.**

LILE, V.P.J., LUMPKIN, STRUBHAR, JJ., concur.

CHAPEL, J.: concurs in results.

---

**21.** In Proposition 17, Appellant argues that he is exempt from imposition of a death sentence under *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); alternatively, he asks this Court to remand for an evidentiary hearing to determine whether sufficient evidence exists to support that claim. In Proposition 20, Appellant contends that the accumulation of trial errors deprived him of a fair sentencing proceeding. In Proposition 21, Appellant argues that his death sentence was the result of passion and prejudice.